**PALM HARBOR HOMES, INC. and Newco Homes, L.P. d/b/a C & S Magnahome, Relators,**

**v.**

**Honorable Robert McCOY, Judge 48th District Court, Tarrant County, Texas, Respondent.**

**No. 2–97–040–CV.**

Court of Appeals of Texas, Fort Worth.

April 10, 1997.

Rehearing Overruled May 29, 1997.

Bush Craddock & Reneker, L.L.P., Michael J. Craddock, Meloney J. Cargil, Dallas, for Relators.

Jenks Garrett, Arlington, for Real Party.

Before RICHARDS, DAY and LIVINGSTON, JJ.

## OPINION

PER CURIAM.

This is an original proceeding on a petition for writ of mandamus. The primary issues we must decide in this case are:

- Whether the parties' arbitration agreement is governed by the Federal Arbitration Act (the FAA);
- Whether the real parties in interest put on any evidence of their fraud in the inducement defense; and

- Whether the real parties in interest put on any evidence of their lack of mutuality defense.

We hold that the arbitration agreement is governed by the FAA and that the FAA preempts application of the Texas General Arbitration Act (the Texas Act) in this case. We further hold that the real parties in interest did not put on any evidence to support either of their affirmative defenses. Accordingly, we conditionally grant the writ of mandamus.

## I. Background Facts.

In August 1993, plaintiffs and real parties in interest Joe and Betty Golden bought from Newco Homes, L.P., d/b/a C & S Magnahome (Newco) a mobile home manufactured by Palm Harbor Homes, Inc. (Palm Harbor).[1] At the time of the purchase, Newco and the Goldens entered into an arbitration agreement, which provides in part:

> The parties to the Retail Installment Contract agree that any and all controversies or claims arising out of, or in any way relating to, the Retail Installment Contract or the negotiation, purchase, financing, installation, ownership, occupancy, habitation, manufacture, warranties (express or implied), repair or sale/disposition of the home which is the subject of the Retail Installment Contract, whether those claims arise from or concern contract, warranty, statutory, property or common law, will be settled solely by means of final and binding arbitration before the American Arbitration Association (AAA) in accordance with the rules and procedures of the AAA....
>
> ....
>
> The parties agree that this Arbitration Provision inures to the benefit of, and is intended to be for the benefit of, the manufacturer of the home [Palm Harbor] which is the subject of the Retail Installment Contract as fully as if the manufacturer was a signatory to the Retail Installment Contract.

---

1. Newco and Palm Harbor are the relators in this proceeding. We will refer to them as "Relators" when discussing them collectively and as "Newco" and "Palm Harbor" when discussing them individually.

On July 31, 1995, the Goldens sued Relators because of alleged defects in the mobile home, raising breach of warranty, DTPA, and negligence claims. Relators moved to compel arbitration in accordance with the arbitration agreement. The Goldens responded that the arbitration agreement was invalid and unenforceable due to fraud in the inducement and lack of mutual consideration.

After a hearing on November 15, 1996, Respondent Judge Robert McCoy denied the motion to compel arbitration. Relators assert the judge abused his discretion by making this ruling.

The Goldens counter that Judge McCoy did not abuse his discretion by denying the motion to compel because: (1) the FAA does not apply to the arbitration agreement; and (2) the agreement is invalid and unenforceable due to fraudulent inducement, lack of consideration, and because Newco failed to obtain the Goldens' attorney's signature on the Retail Installment Contract, as required by the Texas Act.

■ When a party is denied the benefit of an arbitration agreement, mandamus is the appropriate remedy to enforce the agreement if the agreement is governed by the FAA. *Jack B. Anglin Co., Inc. v. Tipps,* 842 S.W.2d 266, 272 & n. 11 (Tex.1992) (orig.proceeding). Thus, if the arbitration agreement in this case is valid and governed by the FAA, Relators are entitled to mandamus relief. *Id.*

## II. The arbitration agreement is governed by the FAA.

■ The FAA provides that a

written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (1970).

The parties' dispute about the FAA's applicability to their arbitration agreement turns on the interpretation of "involving commerce." Relators contend that this phrase should be interpreted broadly to include any contract or transaction that affects interstate commerce. The Goldens contend that "involving commerce" should be interpreted more narrowly to include only those contracts that *substantially* affect interstate commerce. We agree with Relators.

The United States Supreme Court has held that the word "involving" in the FAA is broad and the functional equivalent of "affecting," signaling Congress' intent to exercise its Commerce Clause power to the full. *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 272–74, 276–78, 115 S.Ct. 834, 839, 841, 130 L.Ed.2d 753, 764, 766 (1995). Whether the parties contemplated that their transaction would substantially affect interstate commerce is irrelevant; if the transaction affects interstate commerce "in fact," the arbitration provision is governed by the FAA. *Id.* at 268–70, 276–78, 115 S.Ct. at 837, 841, 130 L.Ed.2d at 761, 766.

The Goldens assert that the Supreme Court has "recently clarified that ... Congress' power to legislate under the commerce clause of the U.S. Constitution only extends to areas which *substantially affect* interstate commerce." The Goldens cite *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), as support for their position and argue that *Allied–Bruce* and the other cases Relators rely on are "out-dated."

*Lopez* is not on point and does not factor into our decision. The *Lopez* Court reviewed the constitutionality of a provision in the Gun–Free School Zone Act of 1990 that forbade "any individual knowingly to possess a firearm at a place that the individual knows ... is a school zone." *Id.* at ——, 115 S.Ct. at 1626, 131 L.Ed.2d at 632.[2] Finding that this provision was a criminal statute that *by its terms* has nothing to do with "commerce" or any sort of economic enterprise, the Supreme Court held that the statute was invalid as beyond the reach of Congress' commerce power. *Lopez,* 514 U.S. at ——, 115 S.Ct. at 1630–31, 131 L.Ed.2d at 638–39.

**2.** *See* 18 U.S.C. § 922(q)(2)(A) (Supp.1997) for the current, post-*Lopez* version of this statute.

The extent of Congress' power to legislate is not at issue here; unlike in *Lopez*, the Goldens have not challenged the constitutionality of the FAA.[3] Thus, the only issue we must address is the how broad Congress intended the term "involving commerce" to be. We follow the Supreme Court in holding that a transaction involves commerce under the FAA if it "in fact" affects interstate commerce. *Allied–Bruce*, 513 U.S. at 268–70, 276–78, 115 S.Ct. at 837, 841, 130 L.Ed.2d at 761, 766.

Even before *Allied–Bruce* was decided, Texas courts interpreted "involving commerce" broadly. *See, e.g., Lost Creek Mun. Util. Dist. v. Travis Indus. Painters, Inc.,* 827 S.W.2d 103, 105 (Tex.App.—Austin 1992, writ denied) (commerce not limited to shipment of goods but also includes all contracts *relating to* interstate commerce) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 401 n. 7, 87 S.Ct. 1801, 1805 n. 7, 18 L.Ed.2d 1270, 1276 n. 7 (1967)).

■ Applying *Allied–Bruce's* "commerce in fact" rule to this case, the FAA governs the parties' arbitration agreement if their transaction as a whole—the purchase and installment of a mobile home—involved commerce. We hold that the transaction did, in fact, involve commerce. The record[4] shows:

- Palm Harbor is a Florida corporation with its principal place of business in Dallas County, Texas;
- Palm Harbor has manufacturing facilities in six different states;
- The Goldens' mobile home was manufactured in Palm Harbor's Austin, Texas plant;
- Palm Harbor's mobile homes include components purchased or manufactured in at least fourteen different states, Mexico, and Canada;

- Palm Harbor's Continuous Manufactured Housing Bond was issued by Frontier Insurance Company of New York, located in Monticello, New York;
- The Goldens bought their mobile home in Fort Worth, Texas, for delivery to Wichita Falls, Texas;
- The mobile home was too wide to be taken out of Texas.

This evidence is sufficient to establish that the parties' transaction involved interstate commerce in fact. *See, e.g., BWI Cos. v. Beck,* 910 S.W.2d 620, 622–23 (Tex.App.—Austin 1995, orig. proceeding) (arbitration agreement between employer and employee related to interstate commerce, even though employee only worked and made deliveries in Texas, because employer had facilities in Texas and other states); *Lost Creek,* 827 S.W.2d at 105 (arbitration agreement between Texas residents, concerning work performed in Texas, related to interstate commerce because paint and epoxy were manufactured outside Texas, and contractor's performance bond was issued by nonresident surety company; thus, arbitration agreement was enforceable under the FAA).

The Goldens cite *Porter & Clements, L.L.P. v. Stone,* 935 S.W.2d 217 (Tex.App.—Houston [1st Dist.] 1996, no writ) as support for their position that this case involves a "purely local mobile home sales transaction" that did not "substantially affect interstate commerce." As we have previously noted, whether a transaction *substantially* affects interstate commerce is not the test. Rather, the test is whether the transaction *in fact* affects or relates to interstate commerce.

Moreover, *Porter & Clements* is wholly inapposite to the Goldens' situation. That case centered around whether a fee agreement between a Texas law firm (Porter &

---

**3.** It is beyond question that the types of activities regulated by the FAA—contracts and transactions "involving commerce"—substantially affect interstate commerce. The Goldens apparently believe that a specific activity in a given situation, rather than a type of activity, must substantially affect interstate commerce before Congress can regulate it. We do not read *Lopez* this way. To the contrary, "where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances

arising under that statute is of no consequence." *Id.* at ——, 115 S.Ct. at 1629, 131 L.Ed.2d at 637.

**4.** Much of the evidence concerning interstate commerce is taken from the affidavits of two of Palm Harbor's officers. The Goldens contend these affidavits are not proper evidence. This argument is waived because the Goldens did not obtain a ruling on their objections in the trial court. Tex.R.App.P. 52(a).

Clements) and two individual Texas residents (the Rabalais) involved interstate commerce.

- The fee agreement was made and to be performed in Texas.
- The fee agreement pertained to a lawsuit that was filed in Texas against Sam's Wholesale Club (Sam's), a nonresident company.
- After the Rabalais lost their lawsuit against Sam's, they sued Porter & Clements because of alleged misrepresentations about the viability of their claims.

Because Sam's was a nonresident, Porter & Clements argued that the fee agreement involved interstate commerce and was thus governed by the FAA. *Id.* at 219. The First Court of Appeals rejected this argument. *Id.*

Regardless of whether we agree with this outcome, the Goldens' sales transaction has many more ties to interstate commerce than did the fee agreement in *Porter & Clements*. In that case, the only possible connection to interstate commerce was the Rabalaises' act of suing a nonresident, if indeed such an act can be characterized as "commerce." In contrast, the Goldens purchased a mobile home that was manufactured in Texas by a nonresident company with parts that were bought and shipped from numerous other states and countries. It cannot be seriously argued that such a transaction, which is the product of national and even international commerce, does not affect interstate commerce. *See, e.g., BWI Cos.*, 910 S.W.2d at 623 (employment contract involved interstate commerce because *employer's* business operations fell within Congress' regulatory power, even though employee worked only in Texas).

The facts of this case show that the parties' arbitration agreement "involves commerce" under the FAA. Accordingly, we hold that the agreement is governed by the FAA.

### III. The arbitration agreement is valid and enforceable.

An agreement to arbitrate is valid, irrevocable, and enforceable unless grounds exist

at law or in equity for the revocation of any contract, such as fraud or unconscionability. 9 U.S.C. § 2 (1970); *Allied–Bruce*, 513 U.S. at 280–82, 115 S.Ct. at 843, 130 L.Ed.2d at 769 (applying the FAA); *Emerald Tex., Inc. v. Peel*, 920 S.W.2d 398, 402 (Tex.App.—Houston [1st Dist.] 1996, no writ) (applying identical provision in the Texas Act).

The Goldens argue that the arbitration agreement is unenforceable for three reasons: (1) their attorney did not sign it; (2) they were fraudulently induced into signing it; and (3) the agreement fails for lack of mutual consideration.

### A. No attorney signature was necessary.

■ The Goldens argue that the arbitration agreement is unenforceable under the Texas Act because their attorney did not sign it. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 171.001(b) (Vernon Supp.1997) (arbitration provision in consumer contract for $50,000 or less is unenforceable unless signed by consumer's attorney). The FAA preempts the application of section 171.001(b) in this case because this section would place the arbitration agreement on unequal footing with other contracts in Texas. *See Doctor's Assocs., Inc. v. Casarotto*, —— U.S. ——, ——, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902, 909 (1996) (holding that FAA preempts state arbitration laws that do not place arbitration agreements on equal footing with other contracts). Thus, the lack of an attorney's signature does not affect the enforceability of the arbitration agreement.

### B. No evidence of fraudulent inducement.

■ The Goldens' primary argument against the validity of the arbitration agreement is that they were fraudulently induced into signing it. The Goldens assert that they were fraudulently induced by Newco's affirmative misrepresentations and by its silence under circumstances creating a duty of disclosure.[5]

---

5. Only the Goldens and Newco were parties to the arbitration agreement; however, the agreement "inures to the benefit of, and is intended to

be for the benefit of, the manufacturer of the home," i.e., Palm Harbor. Thus, Palm Harbor is a third-party beneficiary of the arbitration agree-

Relators assert that Newco did not make any misrepresentations to the Goldens and that Newco did not have any duty of disclosure to the Goldens.

### 1. No duty to disclose.

The Goldens contend that "Relators had an affirmative duty to disclose to [them] all information concerning the mobile home and the sales contract which they knew might negatively influence [the Goldens'] decision to enter the transaction...." This contention is incorrect for several reasons.

■ First of all, the Goldens rely on a provision from the Texas Deceptive Trade Practices Act, which provides that a merchant may not knowingly fail to disclose information about *goods or services* with the intent to induce a consumer to enter into a transaction that he otherwise would not. *See* TEX.BUS. & COM.CODE ANN. § 17.46(b)(23) (Vernon Supp.1997). The arbitration agreement is not a good or service; rather, it is a contract to resolve disputes concerning the Goldens' mobile home in an alternative forum. Because the arbitration agreement is not a good or service, the Goldens cannot rely on section 17.46(b)(23) to establish that Newco had a duty of disclosure.

■ Second, the Goldens' argument goes to the *transaction as a whole*, not just to the arbitration agreement. To avoid arbitration, a fraudulent inducement claim must focus specifically on the negotiation and acceptance of the arbitration provision in a contract, not on the contract as a whole. *Shearson Lehman Bros. v. Kilgore*, 871 S.W.2d 925, 928 (Tex.App.—Corpus Christi 1994, no writ); *see also Prima Paint Corp.*, 388 U.S. at 402–03, 87 S.Ct. at 1805–06, 18 L.Ed.2d at 1276–77; *Bhatia v. Johnston*, 818 F.2d 418, 421 (5th Cir.1987). We cannot consider a claim of fraudulent inducement of a contract gener-

ally in deciding whether an arbitration provision within the contract is valid. *Id.*

■ Third, a party has an affirmative duty to disclose only where a confidential or fiduciary relationship exists or where a party later learns that a previous affirmative representation was false. *Emerald Tex.*, 920 S.W.2d at 403; *Swanson v. Schlumberger Tech. Corp.*, 895 S.W.2d 719, 732 (Tex.App.—Texarkana 1994, writ granted); *Tempo Tamers, Inc. v. Crow–Houston Four, Ltd.*, 715 S.W.2d 658, 669 (Tex.App.—Dallas 1986, writ ref'd n.r.e.) (op. on reh'g). At least one Texas court has held that a home builder has no affirmative duty to disclose to a prospective purchaser *the existence* of an arbitration provision in a home construction contract. *Emerald Tex.*, 920 S.W.2d at 403; *see also Shearson Lehman Bros.*, 871 S.W.2d at 929 & n. 4 (failure to disclose existence of arbitration provision in brokerage agreement was not fraudulent inducement).

■ In this case, the Goldens knew that the arbitration provision existed. Their only complaint is that they were not told about certain *effects* of the arbitration provision: that they would not be able to settle their disputes in court, that they could not have a jury trial, and that they would be limited in the discovery they could take. Because there is no evidence of a confidential or fiduciary relationship between Newco and the Goldens, or that Newco had made a previous representation that was false, Newco had no duty to disclose these effects of the arbitration agreement.[6] In addition, the arbitration agreement expressly states that the parties chose to arbitrate their disputes and that they waived their right to a jury trial. Thus, the agreement contains most of the information the Goldens contend was not disclosed. Having signed the agreement, the Goldens are presumed to know its contents.

ment. *See Corpus Christi Bank & Trust v. Smith*, 525 S.W.2d 501, 503–04 (Tex.1975) (nonparty is third-party beneficiary of contract if that was parties' clear intention, as expressed in words of contract).

**6.** Although the Goldens complain that discovery was limited or would be limited by arbitration, they did not put on any evidence to support this conclusion. In their affidavits supporting their

response in objection to the motion to compel arbitration, the Goldens state that they were "never informed" that Newco wanted the arbitration provision due to its prior experience "that arbitration generally favors sellers of homes, whereas the right to proceed in court generally favors claimants." The Goldens did not present any evidence to support this conclusory allegation.

*Emerald Tex.,* 920 S.W.2d at 402; *see also City of Pinehurst v. Spooner Add'n Water Co.,* 432 S.W.2d 515, 518 (Tex.1968).[7]

For the foregoing reasons, we hold that Newco did not owe the Goldens any affirmative duty to disclose to them the effects of the arbitration agreement.

### 2. No evidence of affirmative misrepresentations.

■ We now turn to the Goldens' affirmative misrepresentations argument. Because the Goldens asserted that they had been fraudulently induced into signing the arbitration agreement, Judge McCoy held an evidentiary hearing. At the hearing, the Goldens bore the burden of presenting sufficient evidence to establish fraudulent inducement. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Longoria,* 783 S.W.2d 229, 231 (Tex.App.—Corpus Christi 1989, orig. proceeding). The proper standard for reviewing Judge McCoy's fact findings with regard to this affirmative defense is "no evidence." *Hearthshire Braeswood Plaza, Ltd. v. Bill Kelly Co.,* 849 S.W.2d 380, 384 (Tex.App.—Houston [14th Dist.] 1993, writ denied); *Merrill Lynch,* 783 S.W.2d at 231.

In determining a no evidence point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is more than a scintilla of evidence to support the finding, the defense is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). But if the Goldens did not put on any evidence of fraudulent inducement, Judge McCoy abused his discretion if he denied Relators' motion to compel on this basis. *Merrill Lynch,* 783 S.W.2d at 231.

To prove fraudulent inducement, the Goldens had to establish that: (1) Newco made a material representation; (2) the representation was false; (3) Newco knew it was false, or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intent that the Goldens should act on it; (5) the Goldens acted in reliance upon the representation; and (6) they suffered injury due to their reliance. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 929–30 (Tex.1983); *Stone v. Lawyers Title Ins. Co.,* 554 S.W.2d 183, 185 (Tex.1977). Newco asserts that it did not make any material misrepresentations to the Goldens concerning the arbitration agreement. We agree.

The evidence concerning Newco's representations to the Goldens is as follows: The documentation—including the arbitration agreement—that the Goldens signed when they purchased their mobile home is standard documentation that each customer is required to sign as part of a Newco sales transaction. When the Goldens asked why they had to sign the arbitration agreement, they were told it was part of the paperwork they had to sign to obtain financing for their mobile home. The only other discussion about the arbitration provision concerned the location of arbitration proceedings. At Mr. Golden's insistence, the parties agreed to hold any arbitration proceedings in Wichita County. Otherwise, Newco would have chosen Tarrant County.

■ The Goldens did not put on any evidence that they would have been able to obtain financing if they had not signed the arbitration agreement. In addition, they do not contest Relators' assertion that signing an arbitration agreement was indeed a prerequisite to receiving financing. Thus, we can accept Relators' assertion as true. TEX. R.APP.P. 74(f). In effect, the Goldens were told that they would not receive financing unless they agreed to arbitrate any potential disputes concerning their new mobile home.[8]

---

7. The record also shows that Mr. Golden's habit when he purchases an expensive item is to read any written contract that accompanies it.

8. If anything, requiring a mobile home purchaser to sign an arbitration agreement to obtain financing would be evidence of unconscionability. The

Goldens have not pleaded unconscionability, however. Even if they had, we agree with the First Court of Appeals that holding routine sales transactions such as the one in this case unconscionable would be to negate public policy in

Notably, the Goldens were *not* told the arbitration agreement would not be enforced or did not mean what it said.

Although the Goldens assert that they were told the only purpose for the agreement was to enable them to obtain financing, there is no evidence to support this assertion. At most, the evidence shows that Newco allowed the arbitration agreement to speak for itself concerning its purpose and did not orally explain to the Goldens the agreement's effects on litigation. However, as we have previously held in our duty to disclose discussion, evidence of Newco's silence is not evidence of fraud.

Because the Goldens did not put on any evidence that Newco made any misrepresentations to them regarding why they had to sign the arbitration agreement, we hold there is no evidence to support the Golden's affirmative defense of fraudulent inducement.

## C. No evidence of lack of consideration.

 Finally, the Goldens contend that the arbitration agreement is invalid and unenforceable due to lack of consideration. There is no evidence in the record to support this contention.

The Goldens' argument is based on the following provision in the arbitration agreement:

> The parties agree that this Arbitration Provision inures to the benefit of, and is intended to be for the benefit of, any lender or mortgagee (or assigns) who provides financing for the purchase of the home which is the subject of the Retail Installment Contract, *at the sole discretion of that lender or mortgagee. Nothing in this contract requires a lender or mortgagee to invoke this Arbitration Provision,* and the lender or mortgagee may do so only if they agree to final and binding determination made by the arbitration process. [Emphasis added.]

The Goldens assert that Newco was the original mortgagee who provided financing for their mobile home purchase. Because

the above provision allows a lender or mortgagee—but not the Goldens—to choose whether to arbitrate, the Goldens contend there is no consideration for the agreement. They contend the promise to arbitrate is illusory because it does not give them any real benefit or create any detriment to Newco. *See Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 496 (Tex.1991) (holding that consideration consists of either a benefit to the promisor or a detriment to the promisee).

This argument lacks merit because the Goldens did not put on any evidence that Newco was a mortgagee. The record indicates only that Newco was the seller of the mobile home and had a security interest in it. While Newco may have made the financing arrangements, there is no evidence it provided the actual financing. Instead, at closing Newco assigned the entire Retail Installment Contract to GreenTree Financial Corporation, and the contract required the Goldens to make all of their payments to GreenTree. Because there is no evidence that Newco was a mortgagee, the provision quoted above does not apply to Newco, and there is no evidence of lack of consideration.

## IV. Conclusion.

Federal and state law strongly favor arbitration. *See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765, 785 (1983); *Prudential Sec., Inc. v. Marshall,* 909 S.W.2d 896, 898 (Tex.1995) (orig.proceeding). Once a party seeking to compel arbitration establishes that an agreement exists under the FAA and that the claims raised are within the agreement's scope, the trial court has no discretion but to compel arbitration and stay its proceedings pending arbitration. *Cantella & Co. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996) (orig.proceeding).

Relators have met this burden: They have established that the arbitration agreement in this case is governed by the FAA and that the Goldens' claims are within the scope of the agreement.[9] The Goldens bore the bur-

---

favor of arbitration. *See Emerald Tex.,* 920 S.W.2d at 402–03.

**9.** The Goldens do not dispute Relators' assertion that the Goldens' claims fall within the scope of

den of defeating the arbitration agreement. *Id.* The Goldens have not satisfied their burden because they failed to present any evidence to support their affirmative defenses. Consequently, Judge McCoy abused his discretion by refusing to stay the underlying proceedings and compel arbitration of the Goldens' claims against Relators. *Id.; Merrill Lynch,* 783 S.W.2d at 231.

A party who is erroneously denied the right to arbitrate under the FAA has no adequate remedy at law, and mandamus relief is appropriate. *Cantella,* 924 S.W.2d at 945; *Prudential Sec.,* 909 S.W.2d at 900; *Tipps,* 842 S.W.2d at 272–73. Accordingly, we conditionally grant the writ of mandamus. We direct the Respondent to rescind that portion of his December 17, 1996 order denying Relators' motion to compel arbitration, order the Goldens' claims against Relators to proceed to arbitration, and abate the underlying lawsuit as to Relators pending arbitration. The clerk is instructed to issue the writ only if the Respondent does not follow our direction.

the arbitration agreement. Thus, we can take this assertion as true. Tex.R.App.P. 74(f).