PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA ex rel.
DAVID L. WILSON, JAMES WARREN,
            *Plaintiff-Appellant,*

v.

KELLOGG BROWN & ROOT,
INCORPORATED; KBR, INCORPORATED;
KELLOGG BROWN & ROOT SERVICES,
INCORPORATED; SERVICES EMPLOYEES
INTERNATIONAL, INCORPORATED,
            *Defendants-Appellees.*

No. 07-1516

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:04-cv-00595-GBL)

Argued: March 19, 2008

Decided: May 16, 2008

Before WILLIAMS, Chief Judge, WILKINSON, Circuit Judge, and
Irene M. KEELEY, United States District Judge for the
Northern District of West Virginia, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Chief Judge Williams and Judge Keeley joined.

## COUNSEL

**ARGUED:** Andrew Grosso, ANDREW GROSSO & ASSOCIATES,
Washington, D.C., for Appellant. John Martin Faust, VINSON &

ELKINS, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Victor Kubli, GRAYSON & KUBLI, P.C., McLean, Virginia, for Appellant. Vanessa M. Griffith, VINSON & ELKINS, L.L.P., Dallas, Texas; Alden L. Atkins, Tirzah S. Fitzkee, VINSON & ELKINS, L.L.P., Washington, D.C., for Appellees.

**OPINION**

WILKINSON, Circuit Judge:

This case arises from a *qui tam* action brought by Relators David L. Wilson and James Warren under the False Claims Act against Kellogg Brown & Root, Inc., Kellogg Brown & Root Services, Inc., KBR, Inc., and Services Employees International, Inc. (collectively "KBR"). Relators allege that KBR fraudulently induced the United States into awarding it an Army task order in connection with its work as a civilian contractor in Iraq. They also allege several employment-related claims stemming from their termination by KBR.

Since initiating this litigation, Relators have consistently sought to shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act. This misguided journey must come to an end. If every dispute involving contractual performance were to be transformed into a *qui tam* FCA suit, the prospect of litigation in government contracting would literally have no end. The district court properly recognized this danger, and we affirm its judgment.

I.

A.

This case concerns the contractual relationship between KBR and the United States government. In December 2001, KBR entered into a Logistics Civil Augmentation Program ("LOGCAP") contract with the Department of Defense. The agreement called for KBR, acting as a civilian contractor, to provide operational support to the United States military in wartime situations. In exchange, KBR was to be

reimbursed costs (up to an agreed-upon maximum amount) and paid a "base fee" of one percent of those costs. In addition, KBR could be awarded up to an additional two percent of costs based on performance assessments by the Army and its LOGCAP Award Fee Evaluation Board.

Under the LOGCAP contract, the military requested specific services or commodities through various task orders. In Task Order 43, the Army called for KBR to provide transportational services in connection with the conflict in Iraq. In particular, KBR was to transport fuel and other supplies from Kuwait to Iraq and between bases within Iraq. Task Order 43 was also accompanied by several Statements of Work ("SOWs") that further detailed KBR's responsibilities and obligations. KBR commenced performance under Task Order 43 and its SOWs in February 2003.

The LOGCAP contract, Task Order 43, and the various SOWs contained several provisions that imposed general safety and maintenance requirements on KBR. For example, the LOGCAP agreement stated that KBR "will ensure the safety and health of personnel, equipment and supplies that the contractor has direct control over, within the [Area of Operation]." It also established that "[a]ll contractor owned motor vehicles shall meet required vehicle requirements within the [Area of Responsibility]," "shall be properly equipped and designed to ensure protection of [Government] property," and shall "be maintained in a safe operating condition and good appearance."

Similarly, an SOW dated July 11, 2003 — and applicable to Task Order 43 from February 21, 2003 through December 31, 2003 — directed KBR to "provide the equipment, tools, parts and personnel" needed for the "maintenance and repair" of the vehicles used to transport fuel and other supplies under the contract. A subsequent SOW, dated December 19, 2003 — and applicable to Task Order 43 from January 1, 2004 through December 31, 2004 — contained many similar provisions, including the obligation to operate "a vehicle maintenance facility" in the theater of operation.

When ordering supplies or services through a task order, the military issues a DD Form 1155 to be executed by the civilian contractor. A DD Form 1155 is a standard document in which the contractor

expressly accepts "the terms and conditions" of the numbered purchase order and "agrees to perform the same." In the present case, such "terms and conditions" include the safety and maintenance provisions noted above.

Although KBR started performing under Task Order 43 in February 2003, it did not execute a corresponding DD Form 1155 until July 24, 2003. This DD Form 1155, however, was effective February 20, 2003 (when KBR commenced performance). According to Relators, KBR could not have been paid for its work in connection with Task Order 43 until it signed the relevant DD Form 1155.

In September-October 2003, KBR hired David Wilson and James Warren to drive supply trucks in Iraq. Both Wilson's and Warren's employment contracts contained an arbitration clause in which each agreed to participate in the company's Dispute Resolution Program and arbitrate "any and all claims that [the employee] might have against [KBR] related to [one's] employment, including [one's] termination."

During their time in Iraq, Wilson and Warren drove a 300-mile convoy route between Base Cedar II, which is located south of Baghdad, and Base Anaconda, which is north of Baghdad. According to Relators, KBR neglected to perform several routine maintenance procedures on the trucks in their convoy. For example, they allege that KBR failed to change the oil or replace the fuel filters and damaged windshields of the convoy trucks. Although Wilson and Warren acknowledge that KBR operated maintenance depots at both military bases, they claim that the maintenance crews did little more than "change a tire" and a "bit of electrical work."

Based on their observations, Wilson and Warren complained to superiors about what they considered the lack of proper maintenance. In addition, after a series of thefts from the convoy trucks, they complained to KBR about inadequate security.

KBR terminated Wilson on March 29, 2004, and Warren three days later. Wilson and Warren claim they were discharged because of their complaints to management about the poor maintenance and security.

B.

On May 21, 2004, Wilson and Warren filed suit against KBR under the *qui tam* provisions of the False Claims Act ("FCA"). *See* 31 U.S.C. §§ 3729-3733 (2000). In addition to their FCA claims, Relators also alleged several employment-related counts, including wrongful termination, quantum meruit, and retaliatory termination in violation of the FCA.

After their initial set of FCA claims were dismissed by the district court,[1] Relators moved for leave to file a third amended complaint. In this proposed complaint, Relators alleged that KBR fraudulently induced the United States into awarding it Task Order 43 by knowingly misrepresenting that it would comply with the order's maintenance requirements. The crux of Relators' claim is a DD Form 1155 signed by KBR in July 2003. According to Relators, when KBR signed the DD Form 1155, and thereby accepted the task order subject to its terms and conditions, KBR knew it had not (since February 2003) and would not fulfill the applicable maintenance and safety requirements under the contract. Thus, Relators posit, the completed form constituted a fraudulent representation by KBR to the United States in order to receive payment under Task Order 43. Because such payments were contingent on KBR's execution of the DD Form 1155, Relators contend that KBR fraudulently induced the United States in violation of the FCA.

After conducting a hearing, the district court denied the motion for leave to file an amended complaint, deeming it futile under *Foman v. Davis*, 371 U.S. 178, 182 (1962). Specifically, the district court held that the amended complaint failed to state a claim under Fed. R. Civ. P. 12(b)(6) since the DD Form 1155 executed in July 2003 did not constitute a "false statement or fraudulent course of conduct" under *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999) ("*Harrison I*"). Instead, the court explained, Relators' allegations were "at best a claim for breach of contract that the gov-

---

[1]Relators' initial claims were premised on a false certification theory and based on payment vouchers KBR had submitted to the Department of Defense. The district court dismissed the claims under Fed. R. Civ. P. 12(b)(6) and, in the alternative, Fed. R. Civ. P. 9(b).

ernment has not asserted." In the alternative, the court held that Relators had not pled fraud with sufficient particularity under Fed. R. Civ. P. 9(b).

With respect to the employment counts, KBR filed a motion to stay the claims on the ground they were subject to binding arbitration pursuant to Relators' employment contracts. The district court granted the motion, finding that Relators and KBR had agreed to arbitrate such employment disputes and that the arbitration agreements were enforceable under either the Federal Arbitration Act or Texas state law.

The district court entered a final judgment on the FCA and employment counts on April 30, 2007. Relators presently appeal (1) the district court's denial of the motion for leave to file a third amended complaint and (2) the district court's decision to stay the employment counts pending arbitration. We address each issue in turn.

II.

Relators first contend that the district court erred when it denied their motion for leave to file a third amended complaint. As noted above, the complaint alleged that KBR fraudulently induced the United States into awarding it Task Order 43 in violation of the FCA. According to Relators, KBR fraudulently represented in a DD Form 1155 that it would comply with the contract's maintenance requirements, all the while knowing it would not do so. We review the district court's denial of the motion for an abuse of discretion. *Laber v. Harvey*, 438 F.3d 404, 428 (4th Cir. 2006) (en banc) (citing *Foman*, 371 U.S. at 182).

Under Rule 15 of the Federal Rules of Civil Procedure, a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although such motions should be granted liberally, a district court may deny leave if amending the complaint would be futile — that is, "if the proposed amended complaint fails to satisfy the requirements of the federal rules." *United States ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 740 (7th Cir. 2007); *Laber*, 438 F.3d at 426, 429.

Because Relators' proposed amended complaint does not properly state a claim under Rule 12(b)(6) and lacks sufficient particularity under Rule 9(b), we find the district court correctly determined that further amendment would be futile. Thus, the district court did not abuse its discretion in denying the motion for leave to file a third amended complaint.

A.

The False Claims Act imposes civil liability on any person who "knowingly presents, or causes to be presented, to [the United States government] a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a). As we explained in *Harrison I*, the term "false or fraudulent claim" includes those instances "when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct." *Harrison I*, 176 F.3d at 787. That is, the fraud may have been in the inducement. *Id.*

In order to prove a fraudulent inducement claim, a plaintiff must demonstrate that (1) "there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." *Id.* at 788. For the reasons discussed below, Relators fail to state a claim upon which relief can be granted under the FCA, *see* Fed. R. Civ. P. 12(b)(6), and instead allege a breach of contract action that only the government may bring.

1.

The first deficiency in Relators' fraudulent inducement claim is that the DD Form 1155 signed by KBR in July 2003 was not a "false statement or fraudulent course of conduct" for the purposes of the FCA. As noted above, a DD Form 1155 is a document that accompanies a corresponding task order and through which the civilian contractor accepts the order subject to all its "terms and conditions," including the safety and maintenance provisions discussed above.

To satisfy this first element of an FCA claim, the statement or conduct alleged must represent an objective falsehood. *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999); *see also United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 797 (E.D. Va. 2007) ("It is well-established that the FCA requires proof of an objective falsehood."). As a result, mere "allegations of poor and inefficient management of contractual duties" are "not actionable under the [FCA]." *See Harrison I*, 176 F.3d at 789. Likewise, "imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA." *Lamers*, 168 F.3d at 1018; *see also Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996).

Relators contend that the completed DD Form 1155 constitutes a false statement because KBR agreed to the maintenance conditions in the contract even though it knew it would not, and later did not, abide by those terms. However, this assertion rests not on an objective falsehood, as required by the FCA, but rather on Relators' subjective interpretation of KBR's contractual duties. Given the imprecise nature of the general maintenance provisions at issue here, it is not exactly clear what would qualify as adequate (or inadequate) maintenance under Task Order 43. Moreover, although Relators posit that KBR did not properly perform under Task Order 43, the United States government — the actual party to the contract — has not expressed dissatisfaction with KBR's performance in the form of a breach of contract action. Consequently, the question of whether KBR performed sufficient maintenance under the contract represents, at the very least, "a disputed legal question" about the "inefficient management of [one's] contractual duties." This is precisely the sort of claim that courts have determined not to be a false statement under the FCA. *See Hagood*, 81 F.3d at 1477; *Harrison I*, 176 F.3d at 789.

The allegations in Relators' third amended complaint thus stand in contrast to the sort of false statements we found actionable in *Harrison I*. In that case, the FCA relator claimed that the defendant made several objectively misleading statements in an attempt to fraudulently induce the government to award it a Department of Energy contract. For example, the defendant allegedly represented that a particular project would take no more than 1.5 years to complete, even though it knew it would take significantly longer. *Harrison I*,

176 F.3d at 781. Similarly, the defendant purposefully underestimated specific overhead costs when submitting a bid, a practice commonly known as "low-balling." *Id.* at 781-83, 791. We found that such representations, if indeed untrue, constituted false statements under the FCA. *Id.* at 791.

Unlike the statements in *Harrison I*, the representations at issue here do not include objective falsehoods. Relators do not claim that the maintenance provisions in the contract set forth anything resembling a specific maintenance program for the convoy trucks. Likewise, they make no contention that representations were made concerning specific acts of maintenance that KBR knew it lacked the capacity to perform. Instead, KBR's alleged defalcations involve several general and relatively vague maintenance provisions, such as keeping vehicles "in a safe operating condition and good appearance." These sorts of claims do not qualify as objective falsehoods and thus do not constitute false statements under the FCA. *Harrison I* makes clear that "fraud may only be found in expressions of fact which (1) admit of being adjudged true or false in a way that (2) admit of empirical verification." *Id.* at 792 (internal quotations omitted).

While the "phrase 'false or fraudulent claim' in the False Claims Act should be construed broadly," *id.* at 788, it just as surely cannot be construed to include a run-of-the-mill breach of contract action that is devoid of any objective falsehood. An FCA relator cannot base a fraud claim on nothing more than his own interpretation of an imprecise contractual provision. To hold otherwise would render meaningless the fundamental distinction between actions for fraud and breach of contract. *See Strum v. Exxon Co.*, 15 F.3d 327, 329-30 (4th Cir. 1994). This we refuse to do.

2.

In addition to the DD Form 1155 not constituting a false statement under the FCA, Relators' fraudulent inducement claim suffers from a second flaw: the completed form was not "material." Under the FCA, a statement or course of conduct is material if it "has a natural tendency to influence agency action or is capable of influencing agency action." *United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1460 (4th Cir. 1997) (internal quotations omit-

ted); *Harrison I*, 176 F.3d at 791 (quoting *Berge*). Because fraudulent inducement claims are concerned with whether "the contract or extension of government benefit was obtained *originally* through false statements or fraudulent conduct," *Harrison I*, 176 F.3d at 787 (emphasis added), the form's materiality depends on whether it could have influenced the government's decision to award Task Order 43 to KBR. Since Relators allege no facts suggesting that it did, they likewise fail to satisfy this element of a proper fraudulent inducement claim.

The main hurdle confronting Relators is the timing and sequence of the relevant events. It is undisputed that KBR started performing under Task Order 43 in February 2003. However, the DD Form 1155 at issue here was not signed until July 24, 2003 — more than five months after KBR started performing under the task order. Therefore, Relators do not, and could not, allege that the executed DD Form 1155 influenced the Department of Defense's decision to initially award Task Order 43 to KBR. It would be dubious at best to suggest that KBR originally obtained the task order by executing a form five months after it began performance.

Relators instead contend that the DD Form 1155 was material because KBR could not have been paid for its work under Task Order 43 without completing the acceptance form. However, this does not suffice. Even if KBR could not have been paid without signing a DD Form 1155, this does not speak to how Task Order 43 was "obtained originally" through fraudulent inducement.

Furthermore, it is doubtful that the executed DD Form 1155 had the capability or "natural tendency" to influence, in July 2003 or otherwise, Department of Defense decisions with respect to Task Order 43. This is true for at least two reasons. First, the government had already observed KBR's performance under the task order for five months when KBR signed the form in July. Thus, it had ample basis by which to judge KBR and its ability to comply with the task order independent of the DD Form 1155. Second, the DD Form 1155 is simply a standard government document that contains boilerplate acceptance language. Given this, it is even more unlikely that the signing of such a form could have had any effect, let alone a material one, on the government's actions in this case.

Of course, if KBR had tried to get paid for work it had *not* done (as opposed to only the work it had done, as appears the case here), then plaintiffs could have brought and argued such a claim straightforwardly under the FCA. *See Harrison I*, 176 F.3d at 786. Indeed, plaintiffs' initial FCA claims were based on the submission of supposedly fraudulent payment vouchers. However, these claims were dismissed by the district court under Rule 12(b)(6) and Rule 9(b), and Relators have not appealed that dismissal.

Instead of pursuing these claims on appeal, Relators brought an amended complaint in which they shifted their theory of liability from false certification to fraudulent inducement. This brings us to an underlying problem with Relators' case. The plaintiffs' theory of the case is something of a moving target, and plaintiffs' inability throughout this litigation to settle on a straightforward reason for recovery is a revealing indication of the weakness of the underlying action. As it currently stands, plaintiffs have tried to shoehorn what might have been an ordinary FCA claim — and what really is a breach of contract suit — into some sort of fraudulent inducement action. This they simply cannot do.

## B.

We finally agree with the district court that Relators' third amended complaint does not plead fraud with the particularity required by Fed. R. Civ. P. 9(b). To meet this standard, an FCA plaintiff must, at a minimum, describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison I*, 176 F.3d at 784 (internal quotations omitted). These facts are often "referred to as the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 384 (5th Cir. 2003) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). For the reasons that follow, Relators fail to satisfy this settled pleading requirement.

Relators hinge their fraudulent inducement claim on the executed DD Form 1155. While they do provide some details regarding the form itself (such as what it was, when it was signed, and by whom

it was signed), their complaint lacks any specific facts about several important elements of the alleged scheme, including *how* the DD Form 1155 influenced the government's decision to award Task Order 43 to KBR. In addition, Relators fail to adequately plead scienter. Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), an FCA plaintiff still "must set forth specific facts that support an inference of fraud." *Willard*, 336 F.3d at 385 (internal quotations omitted). With respect to KBR's intent when it signed the DD Form 1155, Relators allege that defendants "knew no later than mid-2003 [that] they had failed and would continue to fail to provide adequate [maintenance]." *Third Amended Complaint* ¶ 73. As support for this assertion, Relators allege that "at no time during the period October 22, 2003 through April 1, 2004 did [KBR] perform" oil changes or replace fuel filters and damaged windshields. *Id.* ¶¶ 66-67. Notably, however, Relators do not allege any specific facts from February 2003 (when KBR started performing) to July 2003 (when KBR executed the DD Form 1155). Rather, the factual basis for KBR's purported intent in July 2003 is conduct that took place months afterwards. This does not meet the minimum standards established by Rule 9(b).

Such a tenuous basis from which to infer KBR's intent is especially problematic in light of the fact that "in the context of a fraudulent inducement FCA claim, 'the requisite intent must be coupled with prompt, substantial nonperformance.'" *Custer Battles*, 472 F. Supp. 2d at 798 (quoting *Willard*, 336 F.3d at 386). As the Fifth Circuit explained, it "would be illogical to find fraud where a party secretly did not intend to perform the contract when it was signed, but in actuality did perform." *Willard*, 336 F.3d at 386. Thus, an FCA plaintiff must "show[ ] that the defendant promptly followed through on its intent not to perform." *Id.* Since Relators do not allege any specific facts that could support such a showing of prompt nonperformance (e.g. facts from July or August 2003), their complaint also falls short on this ground.

To the degree Relators allege specific facts relating to contractual nonperformance in their complaint, they are more appropriately viewed as a basis for a breach of contract action, not a fraudulent inducement claim. Thus, if allowed to go forward, Relators' FCA

claim would have to rest primarily on facts learned through the costly process of discovery. This is precisely what Rule 9(b) seeks to prevent. *See Harrison I*, 176 F.3d at 789 ("The clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed." (internal quotations omitted)). It also bears repeating that the United States, the actual party to the contract with KBR, has not brought a breach of contract action expressing dissatisfaction with KBR's performance. We can only conclude that the district court properly rejected Relators' attempt to make an end run around the pleading requirements of Rule 9(b).[2]

## III.

The final issue on appeal is whether the district court erred when it granted KBR's motion to compel arbitration on the employment counts. As noted above, the district court held that Relators' employment claims were subject to arbitration based on agreements located in their employment contracts. We review the court's determination *de novo*. *See Washington Square Sec., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004).

Because the parties clearly and explicitly agreed to arbitrate Relators' employment claims, and because the agreements are enforceable under Texas state law, the district court correctly held that arbitration was required.

## A.

We must first examine whether the parties agreed to arbitrate the claims at issue here. *See Mitsubishi Motors Corp. v. Soler Chrysler-*

---

[2]Relators also allege that KBR made false statements with respect to written assessments submitted to the Army LOGCAP Award Fee Evaluation Board in order to receive a higher award fee. While it is unclear from the complaint and the briefs whether this is intended to be a separate fraudulent inducement claim, even if it were distinct, we would likewise find that it should be dismissed. This is because Relators' vague and cursory allegations arguably do not even meet the pleading requirements of Rule 8(a), let alone the requirements of Rule 9(b). *See Willard*, 336 F.3d at 385. Thus, they also cannot survive the pleadings stage.

*Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Based on the language of Relators' employment agreements, it is evident that they did.

Paragraph 26 of each employment contract, which is entitled "Claims/Disputes," states the following in bold typeface:

"You also agree that you will be bound by and accept as a condition of your employment the terms of the Halliburton Dispute Resolution Program which are herein incorporated by reference. You understand that the Dispute Resolution Program requires, as its last step, that any and all claims that you might have against Employer [KBR] related to your employment, including your termination, . . . must be submitted to binding arbitration instead of to the court system."

Both Wilson and Warren wrote their initials beneath this provision, as well as signed the entire agreement, thereby indicating acceptance of this condition of employment.

As the district court properly found, the employment counts in this case clearly fall within the ambit of the arbitration clause: they are related to Wilson's and Warren's employments, and particularly their terminations. We thus find that the parties agreed to arbitrate all of Relators' employment claims.

### B.

We next examine whether the arbitration clauses are enforceable.

### 1.

As an initial matter, Relators contend that their retaliatory termination claims under the FCA are not arbitrable. This is because, they assert, the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h), prohibits Relators from waiving their right to pursue such a claim in federal court rather than arbitration. We cannot accept such a contention. To the extent Relators rely on the case of *Nguyen v. City of Cleveland*, 121 F. Supp. 2d 643, 647 (N.D. Ohio 2000), which found that FCA retaliation actions were not arbitrable because of a conflict

between "arbitration and the underlying purposes of the FCA," we simply note that the other courts to consider that issue have not found *Nguyen* persuasive. *See United States ex rel. McBride v. Halliburton Co.*, Civil Action No. 05-00828, 2007 WL 1954441, at *4-5 (D.D.C. July 5, 2007) (holding that claims brought under § 3730(h) may be subject to arbitration); *Orcutt v. Kettering Radiologists, Inc.*, 199 F. Supp. 2d 746, 754-56 (S.D. Ohio 2002) (same); *see also Mikes v. Strauss*, 889 F. Supp. 746, 755-57 (S.D.N.Y. 1995) (same); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (noting that "statutory claims may be the subject of an arbitration agreement . . . unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue" (internal quotations omitted)).

Even if the FCA permits a waiver, which we believe it does, Relators assert that the waiver must be stated in clear and unambiguous terms in order to be enforceable. We need not inquire whether the arbitration agreement at issue here meets that standard because we think appellants' proposed standard is inapplicable. Nothing in the text of 31 U.S.C. § 3730(h), which authorizes retaliatory termination claims under the FCA, imposes such a condition. Indeed, § 3730(h) does not even discuss the issue of arbitration.

Furthermore, the primary case upon which Relators rely for their proposed standard, *Brown v. ABF Freight Sys., Inc.*, 183 F.3d 319, 322 (4th Cir. 1999), is readily distinguishable. Unlike the present case, *Brown* involved an arbitration clause that was part of a union-negotiated collective bargaining agreement. *Brown*, 183 F.3d at 320-22. Relying on the Court's decision in *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70 (1998), we held in *Brown* that when interpreting such a collective bargaining agreement, "we will not find an intent to arbitrate statutory [discrimination] claims absent a 'clear and unmistakable' waiver of an employee's 'statutory right to a judicial forum for claims of employment discrimination.'" *Brown*, 183 F.3d at 321 (quoting *Wright*, 525 U.S. at 80-81). However, as the Supreme Court made clear in *Wright*, such a requirement does not apply to "an individual's waiver of his own rights" but "rather [to] a union's waiver of the rights of represented employees." 525 U.S. at 80-81. Since the employment contracts at issue here were negotiated by Relators indi-

vidually, and not by a union on their behalf, *Brown* and *Wright* are inapplicable.

2.

With respect to the enforceability of the arbitration clause more generally, the parties dispute whether the Federal Arbitration Act ("FAA") applies and, if so, whether the agreements are enforceable under it. The parties agree, however, that if the agreements are not governed by the FAA, they are governed by Texas state law. Because the employment contract's choice of law provision specifies the use of Texas law, we need not address the issues involving the FAA. For the reasons that follow, we find that the arbitration agreements are enforceable under Texas law.

Like its federal counterpart, Texas law has a "strong presumption in favor of arbitration." *See Prudential Sec., Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995). In furtherance of that goal, the Texas General Arbitration Act ("TGAA") provides that written arbitration agreements are generally valid and enforceable, subject to a few specific exceptions. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.001-171.002 (Vernon 2005). One such exception requires that the agreement be signed by each party and each party's attorney if it is "an agreement for the acquisition by one or more individuals of property, services, money, or credit in which the total consideration to be furnished by the individual is not more than $50,000." *Id.* § 171.002(a)(2) & (b). Because it is undisputed that the agreements were not signed by Relators' attorneys, the only issue in this case is whether the agreements meet the statutory exception, thus rendering them unenforceable. We find, as did the district court, that Relators' employment agreements do not fall under the exception in § 171.002(a)(2).

Because the exception only applies when "one or more *individuals*" acquire "property, services, money, or credit," the scope of the term individual is critical. *Id.* § 171.002(a)(2) (emphasis added). Both parties agree that under Texas law, the term "individual" encompasses only human beings and does not include corporations. *See* Tex. Penal Code Ann. § 1.07(a)(26) (Vernon 2008); *see also Inteq v. Lotus, LLC*, No. 08-02-00079-CV, 2002 WL 1987938, at * 2 & n.1 (Tex. App.-El

Paso Aug. 29, 2002) (interpreting "individuals" in § 171.002(a)(2)). Since KBR is the party "acquiring" services from the Relators, and because KBR is not an individual under the statute, § 171.002(a)(2) is not applicable to Relators' employment contracts. The arbitration agreements are thus enforceable under the general provisions of the TGAA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.001.

Even if there were a doubt about the non-applicability of § 171.002(a)(2), two additional points strongly counsel a finding that the arbitration clause is enforceable. First, as noted above, there is a heavy presumption in favor of arbitration under Texas law. Second, the exception urged by Relators is often referred to as a "consumer protection" provision. *See In re Educ. Mgmt. Corp.*, 14 S.W.3d 418, 421 (Tex. App.-Houston 2000) (referring to § 171.002(a)(2) as the "consumer exception"); *Palm Harbor Homes, Inc. v. McCoy*, 944 S.W.2d 716, 721 (Tex. App.-Ft. Worth 1997) (noting that the exception applies to "consumer contract[s] for $50,000 or less"). Thus, the exception is likely inapplicable when it comes to standard employment contracts, such as the ones at issue here.

For all these reasons, we are convinced that the arbitration agreements are enforceable under Texas law.

## IV.

With respect to each of these issues, Relators have attempted to avoid a basic principle of contract law. The first is that breach of contract claims are not the same as fraudulent conduct claims, and the normal run of contractual disputes are not cognizable under the False Claims Act. The second is that when parties agree to arbitrate, there is a strong presumption that their contractual agreement is a valid one. Because the district court properly applied these principles, its judgment is

*AFFIRMED*.