**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 13-2190**

─────────────

UNITED STATES OF AMERICA,

        Intervenor/Plaintiff – Appellant,

    and

UNITED STATES ex rel. OMAR BADR,

        Plaintiff,

      v.

TRIPLE CANOPY, INC.,

        Defendant – Appellee.

─────────────

**No. 13-2191**

─────────────

UNITED STATES ex rel. OMAR BADR,

        Plaintiff – Appellant,

      v.

TRIPLE CANOPY, INC.,

        Defendant – Appellee.

─────────────

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (1:11-cv-00288-GBL-JFA)

─────────────

Argued: October 30, 2014          Decided: January 8, 2015

---

Before SHEDD, AGEE, and WYNN, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Shedd wrote the opinion, in which Judge Agee and Judge Wynn joined.

---

**ARGUED:** Charles W. Scarborough, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Earl N. Mayfield, III, DAY & JOHNS, PLLC, Fairfax, Virginia, for Appellants. Tara Melissa Lee, DLA PIPER LLP (US), Reston, Virginia, for Appellee. **ON BRIEF:** Stuart F. Delery, Assistant Attorney General, Joyce Branda, Acting Assistant Attorney General, Michael S. Raab, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dana J. Boente, Acting United States Attorney, Richard W. Sponseller, Assistant United States Attorney, Peter S. Hyun, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant United States of America. Paul A. Prados, Milt C. Johns, Christopher M. Day, DAY & JOHNS, PLLC, Fairfax, Virginia, for Appellant Omar Badr. Joseph C. Davis, Reston, Virginia, Paul D. Schmitt, DLA PIPER LLP (US), Washington, D.C., for Appellee.

---

SHEDD, Circuit Judge:

The Government appeals the district court's dismissal of Counts I and II of its complaint under the False Claims Act (FCA) against Triple Canopy, Inc. Omar Badr, the original relator, also appeals the dismissal of his complaint — including four additional FCA counts (Counts II-V) — against Triple Canopy. For the following reasons, we conclude that the district court correctly dismissed Counts II-V of Badr's complaint, but erred in dismissing Counts I and II of the Government's complaint.

I.

In June 2009, the Government awarded a firm-fixed price contract to Triple Canopy to provide security services at the Al Asad Airbase, the second largest airbase in Iraq.[1] Triple Canopy was one of several security firms awarded the Theatre-Wide Internal Security Services contract; under that contract, security at specific locations was governed by individual Task Orders. The Task Order for Al Asad was TO-11.

Under TO-11, Triple Canopy agreed to provide "internal security services" at Al Asad and to "supplement and augment

---

[1] Because this appeal stems from the grant of a motion to dismiss, we accept as true all well-pled facts in the complaint and construe them in the light most favorable to the Government and Badr. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

3

security operations." (J.A. 98). These services included "providing internal operations at entry control points, internal roving patrols," and "prevent[ing] unauthorized access" by enforcing "security rules and regulations regarding authorized access to [Al Asad] including internal check points." (J.A. 98). TO-11 identified 20 "responsibilities" Triple Canopy was tasked with in providing these services, including typical security functions such as repelling attacks, providing escorts, performing entrance searches, and preventing theft, as well as ancillary services such as running background checks, checking ammunition lists, and computerizing personnel systems. (J.A. 99). As relevant here, the final responsibility was to "ensure that all employees have received initial training on the weapon that they carry, [and] that they have qualified on a US Army qualification course." (J.A. 99) (marksmanship requirement). To satisfy the marksmanship requirement, employees had to score a minimum of 23 rounds out of 40 from a distance of 25 meters. Qualifying scorecards for the guards were to be maintained in their respective personnel files for one year. Nothing in TO-11 expressly conditioned payment on compliance with the responsibilities.

To fulfill TO-11, Triple Canopy hired approximately 332 Ugandan guards to serve at Al Asad under the supervision of 18 Americans. The guards' personnel files indicate that they met

4

the qualifying marksmanship score at a course in Kampala, Uganda. Upon arriving at the base, however, Triple Canopy's supervisors learned that the guards lacked the ability to "zero" their rifles and were unable to satisfy the qualifying score of 23 on the marksmanship course. Thus, shortly after their arrival, Triple Canopy supervisors were aware that the Ugandans could not satisfy the final responsibility of TO-11: the marksmanship requirement. Nonetheless, Triple Canopy submitted its monthly invoices for the guards. After a failed training attempt, a Triple Canopy supervisor directed that false scorecard sheets be created for the guards and placed in their personnel files. Because there was attrition, replacement Ugandan guards arrived at Al Asad during the year. These guards were also unable to satisfy the marksmanship requirement, and consequently additional false scorecards were created.

In May 2010, toward the end of the contract, Triple Canopy attempted to have 40 Ugandan guards qualify in marksmanship before leaving for vacation. None could do so. A Triple Canopy supervisor ordered Omar Badr, a Triple Canopy medic, to prepare false scorecards for the guards, reflecting scores of 30-31 for male guards and 24-26 for the female guards. Triple Canopy's site manager signed these new scorecards and post-dated them, showing that the guards qualified in June 2010.

5

TO-11 was in effect for one year, and Triple Canopy presented 12 monthly invoices for guard services during that time. Each invoice listed the number of guards in service for that month; the term "guard" was undefined. Pursuant to TO-11, a contracting officer representative (COR) was "responsible for acceptance of the services [Triple Canopy] performed." (J.A. 41.) The COR was appointed by the Government and confirmed acceptance of Triple Canopy's guard services by filing a Material Inspection and Receiving Report (DD-250) Form. (J.A. 41). The DD-250 required the COR to accept the services if they "conform[ed] to contract" and to sign the form if the services provided "were received in apparent good condition." (J.A. 73). The COR completed twelve DD-250 forms, none of which included any certification or endorsement from Triple Canopy. In total, Triple Canopy submitted invoices totaling $4,436,733.12 for the Ugandan guards—a rate of $1,100 per month for each guard. Triple Canopy did not receive a renewal of TO-11, and the Ugandan guards were thereafter dispatched to four other contract sites around Iraq: Cobra, Kalsue, Delta, and Basra.

Badr eventually instituted a qui tam action under the FCA against Triple Canopy in the Eastern District of Virginia. Badr alleged five false claims counts: Al Asad (Count I) and Cobra, Kalsue, Basra, and Delta (Counts II-V). The Government intervened on the Al Asad count and filed an amended complaint

6

alleging that Triple Canopy knowingly presented false claims, in violation of 31 U.S.C. § 3729(a)(1)(A) (Count I), and caused the creation of a false record material to a false claim, in violation of § 3729(a)(1)(B) (Count II). Specifically, the Government alleged that Triple Canopy knew the guards did not satisfy TO-11's marksmanship requirement but nonetheless "billed the Government the full price for each and every one of its unqualified guards" and "falsified documents in its files to show that the unqualified guards each qualified as a 'Marksman' on a U.S. Army Qualification course." (J.A. 24). The Government also brought several common law claims.

The district court granted Triple Canopy's motion to dismiss the FCA claims. United States ex rel. Badr v. Triple Canopy, Inc., 950 F.Supp.2d 888 (E.D. Va. 2013). The court first dismissed Count I because the Government failed to plead that Triple Canopy submitted a demand for payment that contained an objectively false statement. Next, the court dismissed Count II because the Government (1) failed to allege a false claim and (2) failed to allege that the COR ever reviewed the scorecards. Finally, the court dismissed Counts II-V in Badr's complaint because he failed to plead with particularity the facts giving rise to the claims. The court also dismissed Count I of Badr's complaint, concluding that Badr lacked standing to press that claim because of the Government's intervention. The court later

7

dismissed the Government's remaining common law claims.[2] Both the Government and Badr filed timely appeals.

## II.

We review de novo the district court's dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). United States ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694, 700 (4th Cir. 2014). To survive a motion to dismiss under the rule, a complaint must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Facts that are "merely consistent with" liability do not establish a plausible claim for relief. Id. (internal quotation marks omitted).

In addition, claims under the FCA "must also meet the more stringent 'particularity' requirement of Federal Rule of Civil Procedure 9(b)." United States ex rel. Ahumada v. NISH, 756 F.3d

---

[2] The district court dismissed each of these counts without prejudice. We requested the parties to brief whether the orders are appealable under Domino Sugar Corp. v. Sugar Workers Local Union 392, 10 F.3d 1064, 1066-67 (4th Cir. 1993) (holding dismissal "without prejudice" is not an appealable order if the "plaintiff could save his action by merely amending his complaint"). Pursuant to Chao v. Rivendell Woods, Inc., 415 F.3d 342 (4th Cir. 2005), both the Government and Badr have elected to "stand" on their complaints and "waived the right to later amend unless we determine that the interests of justice require[] amendment." Id. at 345. Accordingly, we have jurisdiction to hear these appeals.

268, 280 (4th Cir. 2014). Rule 9(b) requires that "an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted). Imposing this requirement serves to deter "fishing expeditions." United States ex rel. Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 789 (4th Cir. 1999) (Harrison I).

## III.

### A.

Section 3729(a)(1)(A) prohibits any person from knowingly "caus[ing] to be presented" to the Government a "false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1)(A). To prove a false claim, a plaintiff must allege four elements: (1) a false statement or fraudulent course of conduct; (2) made with the requisite scienter; (3) that is material; and (4) that results in a claim to the Government. United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 913 (4th Cir. 2003) (Harrison II). A false statement is material if it has "a natural tendency to influence, or be capable of influencing," the Government's decision to pay. 31 U.S.C. § 3729(b)(4). Scienter under the FCA encompasses actual knowledge,

9

deliberate indifference, and reckless disregard, but does not require proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1).

The phrase "false or fraudulent claim" should be "construed broadly," Harrison I, 176 F.3d at 788, "to reach all types of fraud, without qualification, that might result in financial loss to the Government," United States v. Neifert-White Co., 390 U.S. 228, 232 (1968). Liability thus attaches "any time a false statement is made in a transaction involving a call on the U.S. fisc." Harrison I, 176 F.3d at 788.

The district court determined that Count I failed to state a claim because the Government did not allege the first element, a false statement or fraudulent course of conduct. In the court's view, the Government "failed to sufficiently plead that [Triple Canopy] submitted a demand for payment containing an objectively false statement." Triple Canopy, 950 F.Supp.2d at 890. The court reached this determination by reasoning that the Government never alleged that Triple Canopy "invoiced a fraudulent number of guards or billed for a fraudulent sum of money." Id. at 896. The Government argues that Triple Canopy submitted false claims because its monthly invoices billed the Government for guard services although the company knew its guards had failed to comply with one of TO-11's responsibilities, the marksmanship requirement.

10

We have previously recognized that a false claims plaintiff cannot "shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the" FCA. Wilson, 525 F.3d at 373. See also United States ex rel. Steury v. Cardinal Health, Inc., 625 F.3d 262, 268 (5th Cir. 2010) (noting that courts "seek[] to maintain a crucial distinction between punitive FCA liability and ordinary breaches of contract") (internal quotation marks omitted). In Wilson, we concluded that two qui tam relators failed to plead a false claim when the claim was based on "mere allegations of poor and inefficient management of contractual duties." Wilson, 525 F.3d at 377 (internal quotation marks omitted). "An FCA relator cannot base a fraud claim on nothing more than his own interpretation of an imprecise contractual provision," id. at 378, we explained, particularly where the Government never "expressed dissatisfaction" with the contract's performance, id. at 377. See also Harrison I, 176 F.3d at 792 (noting fraud is limited to "expressions of fact which (1) admit of being adjudged true or false in a way that (2) admit of empirical verification") (internal quotation marks omitted).

We reiterated the line between breaches of contract and FCA claims in United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co., 612 F.3d 724, 734 (4th Cir. 2010). In Owens, we rejected claims from a qui tam relator regarding the

11

construction of the United States embassy in Baghdad. While noting that some of the construction work required remediation, we nonetheless explained that "[t]o support an FCA claim, there needs to be something more than the usual back-and-forth communication between the government and the contractor over this or that construction defect and this or that corrective measure." Id. at 729. We summarized the relators' claims as "garden-variety issues of contractual performance" involving "a series of complex contracts pertaining to a construction project of massive scale." Id. at 734. We expressly recognized that the purposes of the FCA were not served by imposing liability on "honest disagreements, routine adjustments and corrections, and sincere and comparatively minor oversights," "particularly when the party invoking [the FCA] is an uninjured third party." Id.

While we have guarded against turning what is essentially a breach of contract into an FCA violation, we have also continued to recognize that the FCA is "intended to protect the treasury against the claims of unscrupulous contractors, and it must be construed in that light." Id. To satisfy this goal, courts have recognized that "a claim for payment is false when it rests on a false representation of compliance with an applicable . . . contractual term." United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1266 (D.C. Cir. 2010) (SAIC). Such "[f]alse certifications" are "either express or implied." Id.

12

While we label the claim in this case as "implied certification," we note that this label simply recognizes one of the "variety of ways" in which a claim can be false. Harrison I, 176 F.3d at 786.[3]

"Courts infer implied certifications from silence 'where certification was a prerequisite to the government action sought.'" SAIC, 626 F.3d at 1266 (quoting United States ex rel. Siewick v. Jamison Sci. & Eng'g, Inc., 214 F.3d 1372, 1376 (D.C. Cir. 2000)). Recognizing that claims can be false when a party impliedly certifies compliance with a material contractual condition "gives effect to Congress' expressly stated purpose that the FCA should 'reach all fraudulent attempts to cause the Government to pay [out] sums of money or to deliver property or

---

[3] The use of "judicially created formal categories" for false claims is of "relatively recent vintage," and rigid use of such labels can "do more to obscure than clarify" the scope of the FCA. United States ex rel. Hutcheson v. Blackstone Medical, Inc., 647 F.3d 377, 385 (1st Cir. 2011). Our focus, regardless of the label used, remains on whether the Government has alleged a false or fraudulent claim. In Harrison I, we briefly noted the existence of implied certification claims and, while mentioning such claims might be "questionable" in the circuit, reserved ruling on their viability. Harrison I, 176 F.3d at 788 n.8. Since Harrison I, however, the weight of authority has shifted significantly in favor of recognizing this category of claims at least in some instances. See United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 305-06 (3d Cir. 2011) (collecting cases from the First, Second, Sixth, Ninth, Tenth, Eleventh, and D.C. Circuits). For the reasons expressed infra, we agree that contractual implied certification claims can be viable under the FCA in the appropriate circumstances.

13

services,'" United States ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 306 (3d Cir. 2011) (quoting S.Rep. No. 99-345, at 9 (1986)), a purpose we explicitly recognized in Harrison I. An example provided by the D.C. Circuit helps explain the benefits of recognizing this theory:

> Consider a company that contracts with the government to supply gasoline with an octane rating of ninety-one or higher. The contract provides that the government will pay the contractor on a monthly basis but nowhere states that supplying gasoline of the specified octane is a precondition of payment. Notwithstanding the contract's ninety-one octane requirement, the company knowingly supplies gasoline that has an octane rating of only eighty-seven and fails to disclose this discrepancy to the government. The company then submits pre-printed monthly invoice forms supplied by the government—forms that ask the contractor to specify the amount of gasoline supplied during the month but nowhere require it to certify that the gasoline is at least ninety-one octane. So long as the government can show that supplying gasoline at the specified octane level was a material requirement of the contract, no one would doubt that the monthly invoice qualifies as a false claim under the FCA despite the fact that neither the contract nor the invoice expressly stated that monthly payments were conditioned on complying with the required octane level.

> SAIC, 626 F.3d at 1269.

Accordingly, we hold that the Government pleads a false claim when it alleges that the contractor, with the requisite scienter, made a request for payment under a contract and "withheld information about its noncompliance with material

14

contractual requirements." Id.[4] The "pertinent inquiry" is "whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment." United States ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1169 (10th Cir. 2010). We appreciate that this theory "is prone to abuse" by parties seeking "to turn the violation of minor contractual provisions into an FCA action." SAIC, 626 F.3d at 1270.[5] The best manner for continuing to ensure that

_____

[4] To that end, we note there are several key distinctions between this case and what we viewed as garden-variety breaches of contract in Owens and Wilson. First, this case does not involve uninjured third parties making claims against their former employers or contracts under which the Government does not "express[] dissatisfaction." To the contrary, the Government has clearly expressed its displeasure with Triple Canopy's actions by prosecuting this action. In addition, this is not a case involving subjective interpretations of vague contractual language. In Wilson we noted that the relators "do not claim that the maintenance provisions . . . set forth anything resembling a specific maintenance program." Wilson, 525 F.3d at 377. Absent such specific language, the relators could not prove an "objective falsehood." Id. Here, the Government has presented an objective falsehood—the marksmanship requirement is a specific, objective, requirement that Triple Canopy's guards did not meet.

[5] Triple Canopy argues that implied representations can give rise to liability only when the condition is expressly designated as a condition for payment. "Of course, nothing in the statute's language specifically requires such a rule," and we decline to impose Triple Canopy's proposed requirement. SAIC, 626 F.3d at 1268. In practice, the Government might have a difficult time proving its case without an express contractual provision. Because the FCA violations must be "knowing," the Government must establish that both the contractor and the Government understood that the violation of a particular contractual provision would foreclose payment. In addition, (Continued)

15

plaintiffs cannot shoehorn a breach of contract claim into an FCA claim is "strict enforcement of the Act's materiality and scienter requirements." Id.; see also United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 388 (1st Cir. 2011) (same). In addition, parties who engage in abusive litigation remain subject to appropriate sanctions, whether in the context of the FCA or otherwise.

B.

Applying these standards, we readily conclude that the Government has sufficiently alleged a false claim for purposes of Rule 12(b)(6) and Rule 9(b). TO-11 lists the marksmanship requirement as a "responsibility" Triple Canopy must fulfill under the contract. The complaint contains an abundance of allegations that Triple Canopy did not satisfy this requirement and, instead, undertook a fraudulent scheme that included falsifying records to obscure its failure. The Government's complaint also properly alleges that Triple Canopy's supervisors had actual knowledge of the Ugandan guards' failure to satisfy

---

because the violation must be material, not every part of a contract can be assumed, as a matter of law, to provide a condition of payment. Cf. Mann v. Heckler & Koch Def., Inc., 630 F.3d 338, 346 (4th Cir. 2010) (finding no fraud or FCA violation even though contractor's actions "may have violated federal bidding regulations").

the marksmanship requirement and ordered the scorecards' falsification.

Turning to materiality, in implied certification cases this element operates to protect contractors from "onerous and unforeseen FCA liability as the result of noncompliance with any of potentially hundreds of legal requirements" in contracts, because "[p]ayment requests by a contractor who has violated minor contractual provisions that are merely ancillary to the parties' bargain" do not give rise to liability under the FCA. SAIC, 626 F.3d at 1271. To establish materiality, the Government must allege the false statement had "a natural tendency to influence, or be capable of influencing," the Government's decision to pay. 31 U.S.C. § 3729(b)(4). "Express contractual language may 'constitute dispositive evidence of materiality,' but materiality may be established in other ways, 'such as through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue.'" Hutcheson, 647 F.3d at 394 (quoting SAIC, 626 F.3d at 1269).

The Government has sufficiently pled materiality under this standard. First, common sense strongly suggests that the Government's decision to pay a contractor for providing base security in an active combat zone would be influenced by knowledge that the guards could not, for lack of a better term,

17

shoot straight. In addition, Triple Canopy's actions in covering up the guards' failure to satisfy the marksmanship requirement suggests its materiality. If Triple Canopy believed that the marksmanship requirement was immaterial to the Government's decision to pay, it was unlikely to orchestrate a scheme to falsify records on multiple occasions.

Like the hypothetical gasoline supplier, Triple Canopy agreed to provide a service that met certain objective requirements, failed to provide that service, and continued to bill the Government with the knowledge that it was not providing the contract's requirements. In addition, Triple Canopy then endeavored to cover up its failure. Distilled to its essence, the Government's claim is that Triple Canopy, a security contractor with primary responsibility for ensuring the safety of servicemen and women stationed at an airbase in a combat zone, knowingly employed guards who were unable to use their weapons properly and presented claims to the Government for payment for those unqualified guards. The Court's admonition that the FCA reaches "all types of fraud, without qualification" is simply inconsistent with the district court's view of the FCA that Triple Canopy can avoid liability because nothing on the "face" of the invoice was objectively false. Neifert-White, 390 U.S. at 232.

18

Accordingly, because the Government has sufficiently alleged that Triple Canopy made a material false statement with the requisite scienter that resulted in payment, we reverse the district court's dismissal of Count I of the Government's complaint.

C.

We also reverse the district court's dismissal of Badr as a party to this claim. The district court, relying on an out-of-circuit district court decision, United States ex rel. Feldman v. City of New York, 808 F.Supp.2d 641 (S.D.N.Y. 2011), held that Count I of Badr's complaint, which was "virtually indistinguishable" from the Government's, was "superseded" and "therefore dismissed for lack of standing." Triple Canopy, 950 F.Supp.2d at 895 n.1. The FCA does provide that, if the Government elects to participate in a qui tam FCA action, it "shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action." 31 U.S.C.A. § 3730(c)(1). However, the FCA further provides that the relator "shall have the right to continue as a party to the action," subject to certain limitations. Id. We thus conclude that the district court erred in finding that Badr lacked standing to remain as a party on Count I. On remand, the district court is free to decide whether any of the limitations in § 3730(c)(2) apply to Badr.

19

IV.

A.

We next turn to the district court's dismissal of Count II, the Government's false records claim. Section 3729(a)(1)(B) creates liability when a contractor "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The district court dismissed the Government's false records claim for (1) failing to allege a false statement and (2) failing to allege that the COR actually reviewed the falsified scorecards.[6] The district court concluded the scorecards were not material because the Government failed to specifically allege that the COR reviewed them. The court's conclusion, however, misapprehends the FCA's materiality standard.

"[T]he materiality of the false statement turns on whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action." United States ex rel. Berge v. Bd. of Tr. of Univ. of Ala., 104 F.3d 1453, 1460 (4th Cir. 1997) (internal quotation marks omitted); see also 31 U.S.C. § 3729(b)(4). Materiality focuses on the

---

[6] Because we have already determined that the Government adequately pled a false statement, we turn only to the question of whether the false scorecards themselves were "material" to the false statement.

20

"potential effect of the false statement when it is made, <u>not on the actual effect of the false statement when it is discovered</u>." <u>Harrison II</u>, 352 F.3d at 916-17 (emphasis added). <u>See</u> <u>also</u> <u>United States ex rel. Feldman v. Van Gorp</u>, 697 F.3d 78, 96 (2d Cir. 2012) (holding materiality requirement is objective, not subjective, and "does not require evidence that a program officer relied upon the specific falsehoods proven"). In other words, the FCA reaches government contractors who employ false records that are capable of influencing a decision, not simply those who create records that actually do influence the decision. Thus, in <u>Harrison II</u>, we rejected the sort of "actual effect" standard used by the district court because a government contractor could never be held liable under the FCA if the governmental entity decides that it should continue to fund the contract, notwithstanding the fact that it knew the contractor had made a false statement in connection with a claim. <u>Harrison II</u>, 352 F.3d at 916-17. Along the same lines, a contractor should not receive a windfall and escape FCA liability if — as the district court suggested here — a Government employee fails to catch an otherwise material false statement. That approach would be doubly deficient: it would inappropriately require actual reliance on the false record and import a presentment requirement from § 3729(a)(1)(A) that is not present in § 3729(a)(1)(B). <u>See</u> <u>United States ex rel. DRC, Inc. v. Custer</u>

21

Battles, LLC, 562 F.3d 295, 308 (4th Cir. 2009). In addition, that approach "does not accomplish one of the primary purposes of the FCA—policing the integrity of the government's dealings with those to whom it pays money." Harrison II, 352 F.3d at 917. The FCA is meant to cover "all fraudulent attempts to cause the Government to pay out sums of money." Neifert-White, 390 U.S. at 233. The district court thus erred in focusing on the actual effect of the false statement rather than its potential effect. A false record may, in the appropriate circumstances, have the potential to influence the Government's payment decision even if the Government ultimately does not review the record.

B.

Applying the proper standard, we find that the Government has properly pled materiality in Count II. The false records in this case — the falsified scorecards — are material to the false statement (the invoices) because they complete the fraud. The false scorecards make the invoices appear legitimate because, in the event the COR reviewed the guards' personnel files, the COR would conclude that Triple Canopy had complied with the marksmanship requirement. TO-11's provisions likewise anticipated that the COR would indeed review the scorecards, as they offered the most direct evidence that Triple Canopy's guards satisfied the marksmanship requirement. The false scorecards were thus integral to the false statement and satisfy

22

the materiality standard. We therefore reverse the district court's dismissal of Count II of the Government's complaint.[7]

## V.

Finally, we address the dismissal of Counts II-V in Badr's complaint. Badr alleged in those counts that Triple Canopy submitted false claims by invoicing the Government for guard services under four additional contracts: Cobra, Kalsue, Basra, and Delta. The sum of Badr's allegations on these counts is as follows: that the Ugandan guards were "demobilized . . . and transferred" to the four contracts while still not "qualified to provide" security services, and that Triple Canopy was "paid by the U.S. Government under terms similar to those under the Al Asad Contract." (J.A. 15). By comparison, in support of his claim regarding the Al Asad airbase, Badr listed dates, specified the actions taken on those dates, and identified the Triple Canopy personnel involved. See, e.g. J.A. at 14 ("Site Manager D.B. instructed [Badr] to falsely indicate that the men had obtained scores in the 30-31 range . . . A new Site Manager, D.B.2., then signed the sheets, falsely post-dating them to

---

[7] Triple Canopy argues in the alternative that the Government has failed to allege causation. Causation is likely not required under § 3729(a)(1)(B). See Ahumada, 756 F.3d at 280 n.8. In any event, causation in this situation is no different than materiality: if the false record had a natural tendency or was capable of influencing agency action, then the record caused the false claim.

23

indicate that the Ugandans had qualified in the following month of June").

The district court correctly dismissed Counts II-V for failing to comply with Rule 9(b). Rule 9(b) requires "at a minimum" that Badr "describe the time, place, and contents of the false representations," United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc., 707 F.3d 451, 455-56 (4th Cir. 2013) (internal quotation marks omitted). We agree with the district court that Badr cannot state a claim by doing "nothing more than simply presum[ing]" that Triple Canopy submitted false claims under those contracts. Triple Canopy, 950 F.Supp.2d at 900. Badr contends that discovery may reveal the contents of the contracts and invoices, but fraud actions that "rest primarily on facts learned through the costly process of discovery" are "precisely what Rule 9(b) seeks to prevent." Wilson, 525 F.3d at 380. See also Harrison I, 176 F.3d at 789 ("The clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed.") (internal quotation marks omitted).

VI.

The FCA is "strong medicine in situations where strong remedies are needed." Owens, 612 F.3d at 726. That strong remedy is needed when, as here, a contractor allegedly engages in a year-long fraudulent scheme that includes falsifying records in

24

personnel files for guards serving as a primary security force on a United States airbase in Iraq. Accordingly, for the foregoing reasons, we reverse the district court's dismissal of Counts I and II of the Government's complaint, we affirm the dismissal of Counts II-V of Badr's complaint, and we remand for proceedings consistent with our opinion.

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED
