**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1273**

JOHN D. LISOTTO,

             Plaintiff - Appellant,

        v.

NEW PRIME, INC., d/b/a Prime, Inc.,

             Defendant - Appellee.

Appeal from the United States District Court for the District of
South Carolina, at Columbia.   Mary G. Lewis, District Judge.
(3:13-cv-02407-MGL)

Argued:  March 22, 2016                    Decided:  May 3, 2016

Before SHEDD, THACKER, and HARRIS, Circuit Judges.

Vacated and remanded by unpublished per curiam opinion.

Rebecca Guental Fulmer, LAW OFFICES OF WILMOT B. IRVIN,
Columbia, South Carolina, for Appellant.   Reginald Wayne
Belcher, TURNER PADGET GRAHAM & LANEY P.A., Columbia, South
Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

John D. Lisotto ("Appellant") filed an Americans with Disabilities Act ("ADA") claim against Appellee New Prime, Inc. ("Prime") after Prime failed to hire him as a truck driver. Prime, contending that Appellant should have exhausted his administrative remedies with the Federal Motor Carrier Safety Administration ("FMCSA"), moved to dismiss the complaint. The district court agreed and dismissed the complaint without prejudice.

The FMCSA regulation upon which the district court relied contemplates "a disagreement between the physician for the driver and the physician for the motor carrier concerning the driver's qualifications." 49 C.F.R. § 391.47(b)(2). However, because the parties did not "disagree[]" about Appellant's qualifications at the time Prime denied employment to Appellant, 49 C.F.R. § 391.47(b)(2) is inapplicable. Therefore, we vacate the district court's judgment and remand.

I.

Appellant's complaint sets forth the following allegations, which we accept as true. See Johnson v. Am. Towers, LLC, 781 F.3d 693, 709 (4th Cir. 2015).

On August 19, 2010, Appellant, an experienced commercial truck driver, applied for a driver position with Prime. Appellant began "trucking" in 1971 and had around seven

2

years' experience as a long-distance truck driver hauling gasoline, diesel fuel, and ethanol throughout the United States. J.A. 6.[1] At the time of his application to Prime, Appellant was employed as a correctional officer for the South Carolina Department of Corrections, earning around $30,000 a year.

On August 27, 2010, a recruiter from Prime, Sheryl Lindsay, sent Appellant an email stating he was approved to attend Prime's orientation program in Springfield, Missouri. Lindsay also explained that as part of the hiring process, Appellant would be required to pass a physical examination and drug screen in accordance with FMCSA standards. Lindsay bought Appellant a one-way bus ticket to Springfield and explained that after a successful orientation, he would receive his assigned truck and drive back to South Carolina to work out of Columbia.

Appellant had a sleep disorder "believed to be or diagnosed as narcolepsy." J.A. 7. In anticipation of his physical and drug screen, he obtained a letter from his physician, Dr. Crook. The letter explained that Appellant took Dexedrine, a type of amphetamine, to manage the sleep disorder. Dr. Crook opined "that the prescribed medication would not adversely affect [Appellant's] ability to safely operate a

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

commercial motor vehicle, as [Appellant] had for many years been driving commercial trucks safely . . . while taking [Dexedrine] and had experienced no problems with narcolepsy." Id. at 10-11.

On September 22, 2010, Appellant, having quit his job with the Department of Corrections, travelled to Springfield for orientation. He reported for his physical examination and drug test and explained to Prime's medical examiner, Dr. Abraham, that he was taking Dexedrine "to address a condition believed to be or diagnosed as narcolepsy." J.A. 10. He gave Dr. Abraham the letter from Dr. Crook and showed him his prescription for Dexedrine. Dr. Abraham did not determine that Appellant was unqualified for the position because he had narcolepsy; rather, he noted that Appellant "needs to be off Dexedrine at least 1 month." Id. at 11 (alteration omitted). Dr. Abraham further noted that Provigil is the "[o]nly med[ication] . . . taken for narcolepsy" that Prime would accept, and Appellant "need[ed] to be on it for at least 6 weeks [and] document[] [his] stability" before beginning employment with Prime. Id.

Appellant returned to orientation, and about an hour later, one of Prime's nurses called Appellant out of his session and told him "he could not work for Prime because he had tested positive for amphetamines." J.A. 11. Echoing Dr. Abraham, the nurse said Prime would accept truckers taking Provigil, but not Dexedrine, and instructed him to return home and take Provigil

4

for six weeks to see how it would affect him. Appellant left Springfield and went back to South Carolina to comply with Prime's directives.

Two days later, on September 24, 2010, Prime's Medical Review Officer ("MRO"), Dr. Mauldin, phoned Appellant and stated "he needed to hear from [Appellant's] doctor about his medical condition and prescribed medication." J.A. 11; see also 49 C.F.R. § 40.129(a)(4) (when a drug test result is positive, before "verify[ing]" the test, an MRO must "conduct a verification interview [which] must include direct contact in person or by telephone between [the MRO] and the employee");[2] id. § 40.131(a) ("When . . . the MRO . . . receive[s] a confirmed positive . . . test result from the laboratory, [he or she] must contact the employee directly . . . on a confidential basis, to determine whether the employee wants to discuss the test result."). Dr. Mauldin claimed that if he did not hear from Appellant's doctor within five days, he would report "a positive drug test for amphetamines" to the Department of Transportation ("DOT"). J.A. 11. Appellant called his physician, Dr. Crook, "right away," and explained Dr. Mauldin's request. Id. Dr. Crook phoned Dr. Mauldin on September 27, but no one answered

---

[2] The term "employee" includes "applicants for employment subject to pre-employment testing." 49 C.F.R. § 40.3.

the call.  He "persisted in trying to reach Dr. Mauldin but was never able to reach him or anyone else in his office."  Id. at 20.

On September 27, 2010, Dr. Crook changed Appellant's medication to Provigil, and he experienced no detrimental side effects.  On November 1, Appellant called Lindsay and told her he had complied with Dr. Abraham's and the nurse's directives. Lindsay forwarded the call to Prime's personnel office, and an employee in that office told him, "You cannot work for Prime because you tested positive for amphetamines" and hung up.  J.A. 12.

On November 19, 2010, Appellant wrote to Dr. Mauldin, asking that he "reevaluate the circumstances of the drug test he had taken during his physical on September 22, 2010."  J.A. 12, 30.  Appellant explained,

> I am not saying the test was incorrect, it was correct.  However I was under [Dr. Crook's] care and he tried to contact your office numerous times and could not reach anyone and get an answer. . . .
>
> [Dr. Crook] changed my medication to one acceptable to your office and the [DOT] . . . .
>
> Thank you for your consideration.  This is effecting [sic] my career and my livelihood through no fault of my own.

Id. at 30.  Dr. Mauldin finally responded via letter nearly two months later, on January 12, 2011, stating, "Even though you had

a prescription for amphetamines, in my opinion you have a disqualifying medical condition since narcolepsy is a safety concern." Id. at 12 (the "Mauldin Letter").

After receiving the Mauldin Letter, Appellant participated in a sleep study and learned "that he did not have narcolepsy but experienced 'moderate obstructive sleep apnea.'" J.A. 13. After beginning to use a breathing machine at night, he no longer needed medication to stay awake. On May 25, 2013, Appellant wrote to Dr. Mauldin, explaining that he no longer needed medication, and forwarded the results of the sleep study. He closed the letter, "[W]ould you please consider clearing my name so I can drive again!" Id. at 31. He received no response.

Thereafter, Appellant applied for other truck driving positions, but he was unable to obtain employment. One employer told him his company "could not hire him because he had a record of abusing amphetamines." J.A. 13. Appellant became homeless and "suffered extreme emotional distress." Id. He was eventually able to obtain another job paying near minimum wage.

After receiving a right-to-sue letter from the Equal Employment Opportunity Commission, Appellant filed suit in the District of South Carolina on September 5, 2013. Prime filed a motion to dismiss, contending: (1) Appellant failed to exhaust administrative remedies pursuant to 49 C.F.R. § 391.47

(providing that the FMCSA resolves "conflicts of medical evaluation" where "a disagreement [exists] between the physician for the driver and the physician for the motor carrier concerning the driver's qualifications"); and (2) Appellant was not a "qualified individual" under the ADA, see 42 U.S.C. § 12112(a).

On August 28, 2014, the district court adopted the recommendation of the magistrate judge and dismissed the complaint without prejudice because Appellant failed to exhaust administrative remedies as required by 49 C.F.R. § 391.47(b)(2). The district court declined to address Prime's argument that Appellant is not a "qualified individual." On September 2, 2014, Appellant filed a motion to alter or amend the judgment pursuant to Rule 59(e) and also asked for stay of the district court's decision. The district court denied both requests, and Appellant filed a timely notice of appeal.

II.

We review de novo the district court's dismissal of a complaint. See SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015). "[W]e accept as true all well-pled facts in the complaint and construe them in the light most favorable to [Appellant]." United States v. Triple Canopy, Inc., 775 F.3d 628, 632 n.1 (4th Cir. 2015). We must also draw

8

"all reasonable inferences in [Appellant's] favor." DeMasters v. Carilion Clinic, 796 F.3d 409, 421 (4th Cir. 2015).

The magistrate judge and district court both believed that Appellant's claim should have first been presented to the FMCSA because the dispute involved a "disagreement" between Dr. Crook, Appellant's physician, and Dr. Mauldin, Prime's MRO. But Appellant claims there was no "disagreement"; rather, Prime discriminated against him because Prime failed to hire him based on an erroneously verified positive drug test, and "MRO Mauldin failed to correct his verified positive drug test result and downgrade it to negative, pursuant to regulatory procedure." Appellant's Br. 20; see also 49 C.F.R. § 40.123(a) (An MRO "[a]ct[s] as an independent and impartial 'gatekeeper' and advocate for the accuracy and integrity of the drug testing process."); id. § 40.137(a) (An MRO "must verify a confirmed positive test result for . . . amphetamines . . . unless the employee presents a legitimate medical explanation for the presence of the drug[] . . . in his or her system."); id. § 40.123(c) (An MRO "must determine whether there is a legitimate medical explanation for confirmed positive . . . drug tests results from the laboratory.").

We agree with Appellant. First, the complaint can only be read to lodge an ADA claim based on conduct leading up

9

to Prime's failure to hire him in November 2010.  For example, Appellant alleges that Prime violated the ADA by

- refusing to hire him, even though he complied with Dr. Mauldin's request for more information regarding his medical qualifications, and even though that information showed his narcolepsy had been under control for many years;

- refusing to hire him because he tested positive for amphetamines;

- failing to accept his physician's explanation for the positive drug test;

- failing to proceed with the hiring process in light of the information from Dr. Crook, and insisting he change medications;

- reporting a positive drug test; and

- failing to correct the false drug test report made to the FMCSA, DOT, or others.

See J.A. 14-15.  Appellant does not allege that Prime failed to hire Appellant because of the Mauldin Letter, or that Dr. Mauldin reported his concerns regarding Appellant's qualifications to Prime.  Therefore, any opinion Dr. Mauldin may have had about Appellant's qualifications did not serve as a basis for Prime's refusal to hire him.

Having properly framed the basis for Appellant's claim, we next observe that in the time leading up to November 2010, there was no "disagreement" about Appellant's medical qualifications.  There is no question Dr. Crook believed

10

Appellant was medically qualified if he took proper medication. And the only reasonable inference to be drawn from the complaint is that Prime did not reject Appellant's application outright because he had narcolepsy; rather, Prime anticipated that Appellant would return to orientation and be considered for employment once he successfully switched his medication to Provigil. In fact, Prime told him as much. See J.A. 11 (Dr. Abraham told Appellant he "need[ed] to be on [Provigil] for at least 6 weeks [and] document[] [his] stability."); see also id. ("[T]he nurse [stated] that [Prime] would accept the medication Provigil, but not Dexedrine."). Therefore, Dr. Abraham agreed with Dr. Crook that Appellant was medically qualified for employment with Prime, as long as he took proper medication.

Because Appellant's claim is not based on a disagreement between physicians, but rather, on Prime's failure to hire Appellant due to his positive drug test, cases upon which Prime relies are of no import. See, e.g., Harris v. P.A.M. Transp., Inc., 339 F.3d 635, 639 (8th Cir. 2003) (Where company's physicians and medical review staff disagreed with a third party physician's conclusions that a prospective driver was medically certified to drive, "[a]ccording to 49 C.F.R. § 391.47(b)(2), that disagreement brings the question of [the driver]'s physical qualification within the sole province of the

DOT."); Campbell v. Fed. Express Corp., 918 F. Supp. 912, 918 (D. Md. 1996) ("In a case where there are conflicting medical evaluations, such as the conflict [the driver] faced between [two separate companies'] examination outcomes, the driver may submit an application for resolution of the conflict to the [FMCSA]." (emphasis supplied)); Hill v. Houff Transfer, Inc., No. 3:12-cv-357, 2012 WL 5194080, at *3 (E.D. Va. Oct. 19, 2012) (driver's physician "disagree[d]" with third-party physician about his qualifications to remain a commercial truck driver, and thus, "[section] 391.47's procedures appl[ied]").

The discrete issue before us is more akin to the issue presented in Stevens v. Coach U.S.A., wherein a bus driver, Stevens, took a medical leave of absence from his duties with Coach, U.S.A. ("Coach"). See 386 F. Supp. 2d 55 (D. Conn. 2005). Stevens's physician and Coach's medical examiner both cleared him to return to work. See id. at 58-59. But before Coach allowed him to return on a permanent basis, it "sent him through a series of hurdles that prevented his medical fitness from ever being determined." Id. at 65. The District of Connecticut concluded 49 C.F.R. § 391.47(b)(2) was inapplicable because "the crux of Stevens' complaint" "cannot be characterized as 'a disagreement between the physician for the driver and the physician for the motor carrier.'" Id. (quoting

12

49 C.F.R. § 391.47(b)(2)). "[H]urdle[]"-jumping, rather than medical disagreement, is precisely what happened here. Id.[3]

                              III.

For the foregoing reasons, we vacate the district court's judgment and remand for further proceedings.[4]

                                        VACATED AND REMANDED

---

[3] After the district court's dismissal of the complaint, FMCSA's Office of Chief Counsel issued an opinion letter, which, though not binding on this court, is in accord with our decision. The letter states that the FMCSA does not have "provisions for administrative review procedures that would address [Appellant's] grievances . . . ." J.A. 79. Specifically, the FMCSA believed "[t]he record does not contain evidence of a present conflict concerning [Appellant's] medical qualifications . . . ." Id.

[4] After oral argument, Appellant filed a motion to supplement the record on appeal. See Mot. Suppl. R. on Appeal, Lisotto v. New Prime, Inc., No. 15-1273 (4th Cir. Mar. 22, 2016), ECF No. 44. We deny this motion as moot.