**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1281**

SCOTT N. CARLSON,

            Plaintiff - Appellant,

      v.

DYNCORP INTERNATIONAL LLC,

            Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Liam O'Grady, District Judge.  (1:13-cv-00751-LO-TRJ)

Argued:  March 1, 2016              Decided:  August 22, 2016

Before GREGORY, Chief Judge, and MOTZ and THACKER, Circuit Judges.

Affirmed by unpublished opinion.  Chief Judge Gregory wrote the opinion, in which Judge Motz and Judge Thacker joined.

**ARGUED**: Jacob Madison Small, J. MADISON PLC, McLean, Virginia, for Appellant.  Edward T. Ellis, LITTLER MENDELSON, P.C., Philadelphia, Pennsylvania, for Appellee.  **ON BRIEF**: Andrew B. Rogers, LITTLER MENDELSON, P.C., McLean, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Chief Judge:

Appellant Scott Carlson appeals from a district court order dismissing with prejudice his second amended complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Carlson argues that the district court applied the wrong standard in dismissing his claim under the False Claims Act's ("FCA") anti-retaliation provision, 31 U.S.C. § 3730(h). While we agree that the district court applied a standard rendered erroneous by recent amendments to the statute, we nevertheless affirm its decision dismissing the case.

Defendant-Appellee DynCorp International, LLC, is a government contractor which, on May 14, 2012, hired Plaintiff-Appellant Scott Carlson as Director of Stabilization and Governance. DynCorp has substantial government contracts and is therefore subject to the Cost Accounting Standards ("CAS") promulgated by the Office of Federal Procurement Policy's Cost Accounting Standards Board. JA 91. These dictate accounting and billing practices for entities with $50 million or more in government contracts. Carlson is familiar with the CAS owing to twenty years of experience in government contracting while employed at the U.S. State Department.

While at DynCorp, Carlson supervised a team of six employees who performed work on several of the company's government contracts. At least one of these was with the U.S.

2

Agency for International Development ("USAID"), known as the "USAID Mindanao project." Central to this case was the work Carlson and his team did preparing a bid for another contract with USAID, this one dubbed the Rule of Law Indefinite Quantity Contract ("ROL IQC").

Carlson alleges that a major hurdle to securing the ROL IQC arose out of USAID's suspicion that the indirect cost rate DynCorp put in its bid was too low. DynCorp bid lower-than-average indirect costs, and Carlson alleges that indirect cost competition is "the central distinguishing factor amongst bids for service contracts." JA 93.

According to Carlson, he first sought to address concerns about the indirect cost rate during a call with his superiors in September 2012. When he inquired into the low rate, Carlson was given a "clear signal to back off" from DynCorp CFO William Kansky. JA 94. Carlson alleges that Kansky asked him "Who are you?" and "What do you think your role is here?", and then later pulled Carlson's employee file. JA 94-95.

Several months later, in December 2012, DynCorp began altering billing procedures for Carlson's team. Initially the team's access to the overhead work billing code in the timekeeping system was simply eliminated. After Carlson complained to staff in the company's finance department that this could result in employees billing their overhead work as

3

direct work (in order to get credit for that time), DynCorp instructed the team to bill overhead activity to a code leftover from a previous project, the "SWIFT III Zimbabwe Code" (also called the "Zimbabwe Unbillable Code").

Carlson still considered the accounting method irregular and alleges that at this time he became concerned that DynCorp might be attempting to hide its indirect costs from the government. Carlson raised the overhead billing issue with management persistently over the next several months, including by email, comments in the timekeeping system, and verbally with his superiors, noting at least once that he did not think the practices were "legally compliant." JA 97-98. Carlson alleges that he tried to strike a balance by raising the issue without accusing his superiors at DynCorp of illegal conduct. DynCorp did not address his concerns and Carlson never felt he'd been assured that everything was above board.

In March 2013, Carlson was informed that his team had accumulated $75,000 in cost overruns on the USAID Mindanao project. He alleges that DynCorp refused to show him how the overruns had occurred and that the "lack of transparency made it impossible for him to see the alleged costs" despite his requests for more information. JA 98-99.

On April 17, 2013, Carlson delivered the completed ROL IQC bid to USAID. The bid named Carlson himself for a key position,

4

but later that day DynCorp fired him. Carlson was told the termination was due to a reorganization, but when DynCorp provided him with a list of employees terminated in the restructuring Carlson was one of just two people on the list. The other person was not named, but Carlson asserted that the only person fitting the information provided was program director named Eduardo Fernandez. Carlson alleges that he participated in Fernandez's termination and that it was not pursuant to any reorganization.

Carlson filed this FCA suit for retaliatory termination under 31 U.S.C. § 3730(h) in the Eastern District of Virginia on June 20, 2013. An initial complaint was dismissed without prejudice under Rule 12(b)(6) on November 22, 2013, for failure to state a claim. Carlson refiled, and his amended complaint was dismissed, this time with prejudice, for the same reason on February 28, 2014. Carlson timely appealed, but his appeal was placed in abeyance for Ronald P. Young v. CHS Middle East, LLC, No. 13-2342, which was resolved in an unpublished opinion on May 27, 2015, 611 F. App'x 130, 134 (4th Cir. 2014).

## II.

We review the district court's Rule 12(b)(6) dismissal de novo. United States ex rel. Badr v. Triple Canopy, Inc., 775 F.3d 628, 634 (4th Cir. 2015). To survive the motion to

5

dismiss, Carlson must state a plausible claim entitling him to relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Triple Canopy, 775 F.3d at 634. Facts alleged in the complaint are taken as true and all facts are viewed in the light most favorable to the plaintiff. LeSueur-Richmond Slate Corp. v. Fehrer, 666 F.3d 261, 264 (4th Cir. 2012). The Court, however, "need not accept the legal conclusions drawn from the facts, and . . . need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (citations omitted).

The FCA was originally passed in 1863 in response to widespread contractor fraud during the Civil War. "Debates at the time suggest that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).

In order to bring government contractor fraud to light, the FCA has a whistleblower provision which entitles a contractor's employee to relief where "lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter" result in retaliatory conduct by the employer. § 3730(h)(1). To establish a prima facie case under this provision (and thereby survive a motion to dismiss), Carlson must plausibly allege that

6

(1) he engaged in a protected activity; (2) the employer knew about the activity; and (3) the employer retaliated against him in response. See Eberhardt v. Integrated Design & Const., Inc., 167 F.3d 861, 866 (4th Cir. 1999). As explained in greater detail below, this provision establishes two kinds of protected activity for employees of government contractors: that which supports an FCA action against the employer alleging a fraud on the government (whether brought by the government itself or in a qui tam suit on the government's behalf), and that which is part of an effort to stop a FCA violation.

Carlson is seeking to recover under the latter of these two prongs. His theory is that questioning DynCorp's accounting and billing practices and encouraging his staff to do the same amounted to "efforts to stop 1 or more violations of [the FCA]," § 3730(h), and that his termination by DynCorp was in retaliation for engaging in this protected activity.

A.

Before addressing the specifics of Carlson's theory of recovery, we must first interpret § 3730(h) in light of amendments made to the statute in 2009 and 2010.

Prior to 2009, the FCA's whistleblower provision defined protected activity as employee conduct "in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed

7

or to be filed under this section." See False Claims Amendments Act of 1986, Pub. L. 99-562, § 4, 100 Stat. 3153, 3157-58. In interpreting this earlier version of § 3730(h), this Court and others adopted a "distinct possibility" standard, holding that "an employee engages in protected activity when litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility." Eberhardt, 167 F.3d at 869 (citations and quotations omitted).

Since the distinct possibility standard was adopted, § 3730(h) has been amended twice, once in 2009 and again in 2010. The 2009 amendment struck the reference to a FCA action altogether, describing protected activity as "lawful acts done . . . in furtherance of other efforts to stop 1 or more violations" of the FCA. Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617, 1624-25 (2009) ("FERA"). The new provision was grammatically incorrect, however, as the word "other" was extraneous—the provision only covered "other efforts to stop [a] violation." Id. Congress amended § 3730(h) again in 2010, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, § 1079A(c), 124 Stat. 1376, 2079 (2010), adding back some of the previously excised language. The provision now covers employee conduct "in furtherance of an action under this section or other efforts to

8

stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

It is the effect of these changes that is in dispute. Carlson argues that the distinct possibility standard only applies to the pre-2009 language—"in furtherance of an [FCA] action"—and that the "other efforts to stop 1 or more violations" language requires a different, and broader, rule. In other words, he argues that the amendments had the effect of creating two separate prongs to the whistleblower provision, and that the second prong necessarily broadens the provision's coverage. We agree.

First, it is clear that the distinct possibility standard cannot apply to the second prong of § 3730(h). While the first prong refers to activity associated with an action under the FCA, the second prong specifically encompasses "other efforts." It would be nonsensical to say that these efforts only become protected activity if a lawsuit under the FCA becomes a distinct possibility—the second prong is explicitly untethered from any such action. Moreover, the distinct possibility standard winked out of existence for a brief period when Congress excised language from the statute in 2009. In the 2009 FERA amendment to § 3730(h), Congress decided to create an entirely new, and clearly broader, category of protected activity within the FCA by premising coverage on "efforts to prevent 1 or more

9

violations" <u>rather than</u> on the distinct possibility of litigation. Finally, applying the distinct possibility standard to cover both the old and the new language in § 3730(h) would render the latter a nullity in contradiction to the well-established canon that courts engaged in statutory interpretation must "give each word some operative effect." <u>In re Ennis</u>, 558 F.3d 343, 346 (4th Cir. 2009).

The district court therefore erred when it relied on our application of the pre-2009 § 3730(h), stating that "to pass muster under the distinct possibility standard, a plaintiff must be investigating matters that reasonably could lead to a viable FCA action." JA 171 (quoting <u>Glynn v. EDO Corp.</u>, 710 F.3d 209, 214 (4th Cir. 2013) (internal quotation marks omitted). That is no longer the (only) standard for identifying protected activity under this provision.

Instead, we will assume, without deciding, that Carlson is correct in arguing that the second prong of § 3730(h) makes "efforts to stop 1 or more violations" protected activity where those efforts are motivated by an objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA. It is worth noting that several of our sister circuits had adopted such a standard under the earlier, unamended

§ 3730(h).* Fanslow v. Chi. Mfg. Ctr., Inc., 384 F.3d 469, 480 (7th Cir. 2004); Wilkins v. St. Louis Hous. Auth., 314 F.3d 927, 933 (8th Cir. 2002); Moore v. Cal. Inst. of Tech. Jet Propulsion Lab., 275 F.3d 838, 845 (9th Cir. 2002). And more recently a panel of the Sixth Circuit explained in an unpublished opinion that the new "efforts to stop" language added to § 3730(h) demonstrates that the statute covers internal reports of fraud where the plaintiff's "allegations of fraud grew out of a reasonable belief in such fraud." Jones-McNamara v. Holzer Health Sys., 630 F. App'x 394, 399-400 (6th Cir. 2015). Finally, an objectively reasonable belief standard aligns with our treatment of similarly structured whistleblower provisions in Title VII, the Age Discrimination in Employment Act, and the Americans with Disabilities Act. E.g., E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 406-07 (4th Cir. 2005) ("[S]ection 704(a) protects activity in opposition not only to employment actions actually unlawful under Title VII but also employment

---

* While this Court did not adopt that formulation, we did say that the "[distinct possibility] standard requires that protected activity relate to company conduct that involves an objectively reasonable possibility of an FCA action." Mann v. Heckler & Koch Def., Inc., 630 F.3d 338, 344 (4th Cir. 2010). We also rejected the plaintiff's claim in that case in part because "[i]t was unreasonable . . . [for the plaintiff] to expect opposition to such a bid to lead to a viable FCA action." Id. at 346 (emphasis added). Thus, although § 3730(h)'s new language demands a fresh interpretation, our decision today does not substantially depart from past precedent.

11

actions an employee reasonably believes to be unlawful." (citations omitted); Buchhagen v. ICF Int'l, Inc., 545 F. App'x 217, 221 (4th Cir. 2013) (unpublished) ("Even if ICF's actions ultimately do not amount to unlawful age discrimination, the allegations that we found sufficient to support Buchhagen's wrongful discharge claim also suffice to establish that Buchhagen had a reasonable belief that ICF violated the ADEA."); Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002) ("A plaintiff need not establish that the conduct she opposed actually constituted an ADA violation. But a complainant must allege the predicate for a reasonable, good faith belief that the behavior she is opposing violates the ADA.").

The district court therefore erred when it relied on our application of the pre-2009 § 3730(h), stating that "to pass muster under the distinct possibility standard, a plaintiff must be investigating matters that reasonably could lead to a viable FCA action." JA 171 (quoting Glynn v. EDO Corp., 710 F.3d 209, 214 (4th Cir. 2013) (internal quotation marks omitted). That is no longer the (only) standard for identifying protected activity under this provision.

## B.

Having established the applicable standard for applying § 3730(h)'s second prong, we must now determine whether

12

Carlson's complaint establishes that he engaged in protected activity (the first element required for a prima facie retaliation case). In other words, does he allege facts sufficient to show that he believed DynCorp was violating the FCA, that his belief was reasonable, that he took action based on that belief, and that his actions were designed to "stop 1 or more violations of" the FCA?

We find that Carlson has failed to show that his belief that DynCorp was violating the FCA was objectively reasonable.

It is a violation of the FCA to "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment" to the federal government. 31 U.S.C. § 3729(a)(1)(A). It is likewise a violation to "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim." § 3729(a)(1)(B). Carlson's complaint relies primarily on the latter of these, arguing that he feared "his billing entries and those of his staff were being used to create false records of Indirect Costs," JA 98, and that he "was attempting to stop the creation of false records material to a false claim, namely statements of Indirect Costs that did not include [his team's] Indirect Costs, which would violate 31 U.S.C. § 3729(1)(1)(B) [sic]," JA 101. His complaint also asserts that he was "attempting to stop a conspiracy within

13

DynCorp to violate" both of the provisions quoted above. JA 101.

Carlson's evidence that DynCorp was preparing to violate the FCA, as enumerated in his complaint and his response to DynCorp's motion to dismiss, was that (1) he "encountered hostility at any inquiry into the calculation of the indirect cost rate," (2) DynCorp made it impossible for his team to "honestly record their work" in the timekeeping system by compelling staff to bill overhead to an old project code, (3) others at DynCorp thought the changes were inappropriate, and (4) DynCorp never explained its changes or adequately addressed Carlson's internal complaints. JA 151.

None of this, however, states a theory of fraud on the government. As DynCorp has maintained throughout this litigation, all Carlson has accused the company of doing is under billing the government on existing contracts. Carlson has not, in either his original complaint or his briefs to this Court, pointed to any FCA provision or case that would make under billing a violation. As we noted above, the FCA "was intended to reach all types of fraud . . . that might result in financial loss to the Government." Neifert-White Co., 390 U.S. at 232. And it is clear that the Financial Acquisition Regulations ("FAR")—which Carlson accuses DynCorp of violating, Appellant's R. Br. 2-3—anticipate situations where a contractor

14

may "seek[] to enhance its competitive position in a particular circumstance by basing its proposal on indirect cost rates lower than those that may reasonably be expected to occur during contract performance." 48 C.F.R. § 42.707(b)(1)(iii).

Carlson's complaint does not contain "enough factual matter (taken as true) to suggest that" DynCorp made or was about to make a false claim on the government. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). As such, we cannot say that his evidence was enough to make his alleged belief in DynCorp's fraud objectively reasonable—in fact, it was entirely speculative. His complaint articulates no mechanism by which failing to charge certain overhead expenses could later result in the government being fraudulently over billed. As the FAR provision just quoted indicates, "the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy" to violate the FCA. See Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 256 (S.D.N.Y. 1995).

Thus, though Carlson rightly points out that "proving a violation of § 3729 [of the FCA] is not an element of a § 3730(h) cause of action," Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 545 U.S. 409, 416 n.1 (2005), he has failed to raise even a plausible case that what

15

he observed was part of an FCA violation, and thus his alleged belief that DynCorp was violating the FCA was not reasonable.

Carlson also argues that the contract DynCorp obtained from USAID was fraudulently obtained and that any claim for payment submitted under such a contract would violate the FCA. He argues that "hiding" overhead costs in another project's code violated the FAR and CAS, and that because the USAID bid required DynCorp to certify that it was complying with FAR and CAS, the bid contained a false certification.

It is correct that where a contractor makes claims for payment from the government pursuant to a fraudulently obtained contract, there may be liability under the FCA. U.S. ex rel. Marcus v. Hess, 317 U.S. 537, 541 (1943). But Carlson's argument fails here for two reasons. First, we are not bound to accept his "legal conclusion[]" that DynCorp's alleged under billing violated FAR and CAS. Giarratano, 521 F.3d at 302. Despite Carlson's years of experience in government contracting, his amended complaint, his appellate brief, and his oral argument before us have all failed to explain with any particularity how or which provisions of FAR or CAS might have been violated.

Second, even if he could show that FAR and CAS were violated, Carlson still cannot show that he held an objectively reasonable belief that this conduct amounted to a violation of

16

the FCA. "[W]ithout fraud, there can be no FCA action" or violation. Mann, 630 F.3d at 345-46. And it is axiomatic that fraud involves "[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment." Fraud, Black's Law Dictionary (10th ed. 2014) (emphasis added). Carlson alleges that FAR and CAS were violated because DynCorp was under billing the government on other contracts, but this still fails to show how the government would be acting to its detriment in accepting a bid from DynCorp. Surely we cannot be expected to hold that any failure to follow an accounting regulation or best practice on any government contract makes a company a fraudster ineligible to even bid for further business with the United States government? See Univ. Health Servs., Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989, 2002-04 (2016) ("We emphasize, however, that the False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations."). Nor has Carlson pointed to any case where a contract was held to be fraudulently obtained merely for resulting from a bid that incorrectly certified compliance with these accounting regulations. Thus, even if DynCorp's indirect cost accounting practices were not entirely consistent with FAR and CAS—an allegation Carlson has utterly failed to plead with sufficient particularity—Carlson has failed to sufficiently

17

allege how the practice could amount to fraud and thereby support an objectively reasonable belief that the company was violating the FCA.

## III.

Because Appellant Scott Carlson has failed to plausibly allege facts sufficient to show he reasonably believed that DynCorp was engaged in a fraud on the government, we affirm the district court's dismissal of his action under 31. U.S.C. § 3730(h).

AFFIRMED